[Civ. No. 2691. Fourth Dist. Mar. 27, 1942.]

LAURA B. EDGAR, as Administratrix, etc., et al., Plaintiffs and Respondents, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), Appellant; CHARLES FINDLAY et al., Defendants and Respondents.

Harvey, Johnston & Baker, Louis Ferrari, G. D. Schilling and D. Bianco for Appellant.

John W. Preston and Brittan & Mack for Respondents.

GRIFFIN, J.—On February 15, 1921, plaintiffs or their predecessors, and defendants, other than the defendant Bank of America National Trust and Savings Association, hereinafter referred to as the bank, purchased in fee an 80-acre tract of land in Kings County. The recited purchase price of the property was $8,000. Because of the fact that there were some 30 or more of such purchasers, it was deemed necessary and advisable to take title to that property directly from the grantor to a trustee, and accordingly, arrangements were made by the purchasers with the Security Trust Company for title to be conveyed to it under the terms and conditions of a certain trust agreement hereinafter referred to. Upon the recording of the deed, the trust agreement was duly entered into between the purchasers and the trustee Security Trust Company. The trust agreement, in form a declaration by the Security Trust Company on the back of which was endorsed the signatures of the purchasers and owners of the land as the beneficiaries of the trust, contained, among other things, the following provisions:

"c. That the trustee was without power or authority to sell or lease the property except as provided in the agreement as follows:

" 'In case of sale or lease of the property, or any part or portion thereof, the price and terms of sale or lease shall be agreed upon by holders of at least fifty-one per cent (51%) of the interests hereby represented, and the written consent of a 51% interest to said sale or sales, or lease or leases shall be' our authority to make such sale or sales, or lease or leases and our authority for executing a conveyance or lease in accordance therewith;'

"d. The trustee was not required to pay taxes, . . .

"e. The fees for services of the trustee were fixed in the instrument . . ."

Appellant bank succeeded to the interests of the Security Trust Company as trustee without change in the provisions of the trust agreement. The trust property was allowed to remain dormant except for two rights of way, one in 1929 and the other in 1932, which were given by the trustee with the consent of the beneficiaries. From February, 1921, until De-

cember, 1936, the property was rented by the beneficiaries, whenever it could be, for grazing purposes, and the rentals received by them for such purposes did not exceed the amount of taxes. The taxes for the years 1932 to 1935 inclusive, were allowed by the respondents to become delinquent and were paid by the bank on January 5, 1937. During the years 1933, 1934 and 1935, no rental money was received by the beneficiaries for grazing. The taxes on the 80 acres for the years 1932 to 1935, inclusive, averaged $6.11 per year. In the year 1935, one Scott and one Stahl, after some investigation, became convinced that land in the region near respondents' land could be made to produce crops if water therefor could be developed. In October, 1936, a letter was written by Scott and Stahl to the bank to determine whether the 80 acres in question was for sale. This letter was referred to the California Lands, Inc., a subsidiary of the bank, which operated or leased the lands owned by the bank. An investigation was made by the California Lands, Inc., which disclosed that this property was acquired by the bank from one Murray, but such investigation was unsuccessful in disclosing that it was also held in trust for the respondents. The bank and California Lands, Inc., then being under the impression that it was desert land of questionable value upon which payment of taxes had been discontinued, and believing itself to be the owner of the property, sold the surface rights to Scott and Stahl and their respective wives for the sum of $800. $200 was paid down and the balance of $600 was agreed to be paid in various installments thereafter. The oil rights were reserved by the bank and conveyed without consideration to its subsidiary. At this time there was no irrigation of land in the Kettleman plain where this property was located. The entire area was arid and had been used only for pasturing sheep. It had a rental value for such purpose of 15c to 25c per acre per annum. The plan of Scott and Stahl was to drill a well for water on the 80 acres belonging to respondents, leasing several hundred acres of surrounding or near-by land cheaply and conveying the water thus developed to the entire project. After the sale of the surface rights by the bank on December 28, 1936, early in 1937, Scott and Stahl drilled two wells on the 80 acres and developed a large quantity of water (about 1200 gallons per minute per well). Pumping equipment was placed thereon by them. They also paid the cost of the wells and the casings thereon amounting to approximately $4,500.

They also obtained leases on approximately 900 acres to the west and north of the 80 acres at a cost of about 50c to $1 per acre per year. When water was developed on the 80 acres, on March 1, 1937, they executed a lease to one Samples of the 80 acres as well as a sublease covering the 900 acres. The rental to be paid by Samples to Scott and Stahl was approximately $5 per acre per year during the term of the lease and sublease, which lease and sublease were to terminate on August 1, 1942. In October, 1937, one of the beneficiaries noticed that extensive farming operations were being conducted on the 80 acres. This was reported to the bank and an investigation was made. Immediately upon the discovery of the bank's error in selling the trust property, the oil, gas and mineral rights were reconveyed by the California Lands, Inc., to the bank and restored to the trust. Negotiations were then conducted by the bank which on March 10, 1938, resulted in a repurchase of the property by the bank subject to a reservation in the deed from Scott and Stahl reserving unto them the use and occupation of the 80 acres until August 1, 1942, on the payment by them of $200 cash and $400 annually beginning with the first day of August, 1938, to and including August 1, 1941. The water wells and casings were to be maintained in good condition, reasonable wear and tear excepted, and delivered to the bank at the end of the term. The repurchase price paid by the bank for the property subject to' the reserved use was the cancellation of the balance of $500 owing on account of the original purchase price from Scott and Stahl and the further sum of $5,000 cash. This valuation of $5,500 was predicated on the amount that Scott and Stahl had paid for the property and the cost of drilling and equipping the wells with casings. From this transaction it becomes immediately evident that the bank expended at least $4,700 to recover the property for the trust as the result of its mistake.

This action was filed by the plaintiffs and respondents to recover damages for its deprivation of the use, occupancy, rents, issues and profits of the 80 acres for the term of the reservation. Certain of the beneficiaries refused to join as parties plaintiff and were consequently joined as defendants and have become respondents on this appeal. By amendment at the close of plaintiffs' case, and over objection of the appellant, plaintiffs were granted permission to amend their com-

plaint to charge damages for the loss of rents for use of water applied to the 900 acres for the same period. Objection was made by appellant to the trial of the action by a jury on the ground that it was an equitable action. (See *Reay* v. *Reay,* 97 Cal. App. 264 [275 Pac. 533].) This objection was overruled on the ground that the action was one at law. After all of the evidence was in, plaintiffs advised the trial court that they were uncertain as to whether the action was one in equity or at law; that they were willing that the jury be dismissed or retained in an advisory capacity. This point is not raised on appeal. In view of the conduct of the parties neither could complain. (*Hyde* v. *Redding,* 74 Cal. 493 [16 Pac. 380].) The jury was retained by the court in an advisory capacity and returned a verdict against appellant in the sum of $25,000, which verdict was adopted by the court and findings and conclusions were prepared and signed.

From the evidence it becomes immediately apparent that the bank was negligent in the handling of the property of the trust. This is admitted and there is no dispute as to this issue. The only question here presented is whether, under the pleadings and the evidence the court was justified in concluding that the appellant bank was liable to respondents in the sum found. The gist of the complaint is that the respondents purchased and transferred to appellant's predecessor, in trust, 80 acres of real property to be held and managed for the respondents; that appellant sold and repurchased the property; that by reason thereof the respondents "have been deprived of the use and occupancy, rents, issues and profits therefrom, . . . and loss of rental for use of water from said property, the same being distributed to adjacent leases adjoining said property . . ." since the 28th day of December, 1936, and "will continue to suffer damage likewise until the first day of August, 1942, and that by reason thereof these plaintiffs have been damaged in the sum of fifty thousand dollars ($50,000.00)." The jury returned an advisory verdict that respondents had "been damaged by the actions of the defendant" bank in the sum of $25,000. The trial court then prepared separate findings and found that respondents suffered damages in the sum of $25,000 for having been deprived of the *use and occupancy, rents, issues and profits and loss of rents for use of water applied to the adjacent lands,* without specifying particularly whether the amount of the recovery was for

deprivation of use and occupancy of the 80 acres or as rents, issues and profits therefrom, or loss of rental for use of the water from said property, which water was distributed to adjacent leased property, or all of these combined. Judgment was entered for the lump sum of $25,000 as and for ''damages.'' This appeal is from this judgment.

At the outset it will be seen, as a result of the bank's so-called negligent act, on August 1, 1942, the beneficiaries of the trust, instead of having 80 acres of arid sheep grazing land which was producing practically no income and having no great rental value, and on which the taxes were delinquent, will have the same acreage returned to them, enhanced by two large producing wells and casings and the benefits therefrom paid for by funds of the appellant bank. In addition, the trust was paid or will be paid as rental, under the reservation agreement, until August 1, 1942, the sum of $200 cash, plus $400 paid on August 1, 1938, and a like sum on August 1st of each year thereafter, including August 1, 1941, and if this judgment is allowed to stand, the beneficiaries will receive, in addition thereto, the sum of $25,000.

Respondents, in effect, argue that the appellate court is bound to affirm the judgment because there is a conflict in the evidence produced on the issue presented on the question of damages and such conflict must be resolved in favor of the judgment of the trial court. This may be true if the evidence received was competent, relevant and substantial and based on law and reason. To apply the rules claimed by respondents alone to this case would work an injustice and not only give to them the pound of flesh they claim but also innocent blood to which they are not entitled. While appellant bank should be held liable for the result of its negligence in accordance with the rules of law applicable, it cannot be said that respondents may benefit by any judgment that indicates an award of punitive damages. (*Richman* v. *Bank of Perris,* 102 Cal. App. 71, 90 [282 Pac. 801].) From the pleadings, the evidence, and the instructions to the jury, we are unable to determine whether the proper measure of recovery was applied.

Section 2229 of the Civil Code provides that a trustee may not use or deal with the trust property for his own profit or for any purpose unconnected with the trust in any manner. Section 2237 of the Civil Code measures the liability of the trustee for breach of that trust. It provides that a trustee who uses or disposes of the trust property, contrary to section

2229, may, *at the option of the beneficiary,* be required to (1) account for all profits so made, *or* (2) to pay the value of its use, and if he has disposed thereof, (3) to replace it with its fruits, *or* (4) to account for its profits with interest. These remedies are alternative. (*Work* v. *County Nat. Bank, etc. Co.,* 4 Cal. (2d) 532, 537 [51 Pac. (2d) 90] ; *Reay* v. *Reay, supra.*) This section sets forth the extent of the trustee's liability for the breach of the trust here involved, and is aimed at making the beneficiaries whole. (*Clapp* v. *Vatcher,* 9 Cal. App. 462, 466 [99 Pac. 549].) In *Work* v. *County National Bank, etc. Co., supra,* page 537, the court said: ''The alternative remedies given to the beneficiary by section 2237, *supra,* are all aimed to make the beneficiary whole . . . The only way the trust properties can be 'replaced' is to permit the respondents to receive what they would have received had appellant been faithful to its trust.'' In the instant case, respondents, neither by their pleadings nor otherwise, have elected to exercise their option and rely upon any one particular measure of recovery, but have grouped most of the allowed measures of recovery, taken evidence tending to support each one, and the trial court submitted all of the theories of recovery to the jury under instructions that would indicate that it could find on any one or all of the theories mentioned and, without designating in the findings or judgment the particular basis for the judgment, allow an amount which, from the competent evidence received, would appear to exceed any one of the alternative measures of recovery reasonably allowable under the above-mentioned section. Under no theory of law would the plaintiffs be entitled to recover both the value of the use and occupation *and* the rents, issues and profits. If they elected to charge the bank for the value of the use and occupation, the bank would be entitled to retain the rents, issues and profits. They cannot have both. Whether the judgment is for any one or more of these items cannot be determined from the findings. The findings are not definite and furnish no reasonable basis for damages in the sum mentioned in the judgment. (*James* v. *Haley,* 212 Cal. 142 [297 Pac. 920] ; 24 Cal. Jur., p. 935, sec. 183; 24 Cal. Jur., p. 940, sec. 186; *Erving* v. *Jas. H. Goodman & Co.,* 171 Cal. 559 [153 Pac. 945] ; *Yellen* v. *Fidelity & Casualty Co.,* 115 Cal. App. 434, 441 [1 P. (2d) 1019] ; *Hullinger* v. *Big Sespe Oil Co.,* 28 Cal. App. 69, 71 [151 Pac. 369] ; *Armstrong* v. *Rau,* 72 Cal. App. 288, 290 [236

Pac. 937].) The complaint should have charged definitely and specifically the theory under which the recovery was sought. (*Tobin Grocery Co.* v. *Spry*, 204 Cal. 247 [267 Pac. 694].)

Respondents produced lay and expert witnesses who testified, over strenuous objection, in reference to all phases of the claimed damages for the breach of the trust by the trustee. Some of this testimony pertained to loss of profits, some to use and occupancy of the property, some to reasonable rental value of the 80 acres, and other portions pertained to rental value of the water in connection with the 900 acres. This may be illustrated by the testimony of one witness which was received in support of the judgment and is as follows:

"Mr. Brittan: Supposing you were a farmer out in this section and you had no water and you wanted to raise some crops, what would be the reasonable rental value to this farm in this section would be insofar as water being given to his land is concerned? (Objection by Mr. Harvey) . . . Mr. Brittan: I said 'What is the reasonable rental value' . . . A. Of course, it depends upon the crop. He can afford to pay more for crops like cotton than he could for flax or barley or grain. I think a farmer could well afford to pay over that,—may I explain the general contours? Q. Yes. A. This land all has a gentle slope to the north, it is rather smooth and requires some slight floating, which is not a very difficult farming project. From the records given to me by Mr. Samples, it is mostly·productive land." (There was testimony that in the year 1937 Samples raised total crops having a gross value in excess of $40,000; in 1938, in excess of $26,000; and in 1939, in excess of $26,000.) "On that whole property land has no value except for water, without the water it could only be rented for sheep pasture at a small rental (about 25c per acre). *Based upon what I considered Mr. Samples' income I thought he could afford to pay* (italics ours), and based upon what I assumed that anyone could afford to pay on the whole property, something between twelve and fifteen dollars an acre . . .

"Mr. Brittan: Now, having in mind the eighty acre parcel of land where you saw the buildings and so forth, and pumping plant, what would be the reasonable rental value of that land itself? . . . A. . . . I would place the value of rental on that, and it could be cultivated to crops,—oh, I assume you mean crops that bring the largest net rental to the farmer,—

*I think a farmer could pay for that property $15.00 an acre."*
(Italics ours.) A motion to strike the above so-called expert testimony was denied.

"Mr. Brittan: What would be your opinion, based upon your investigation, and also upon your experience as an appraiser and being in the real estate business also, what would be your opinion of the value of the water per acre on the adjacent lands for farming purposes other than the lands of the eighty acres, what would be the rental value per acre per year?" This question was objected to on the ground that "it takes into consideration improvements on the premises and things of that sort which are certainly not proper to charge against these defendants as elements of rental value and incompetent, irrelevant and immaterial, no proper and sufficient foundation laid for the reasons stated." The objection was overruled. "A. . . . Before I can answer that question I would have to determine the cost of the operations, planting, harvesting and sacks. Q. . . . I would like to have what the rental value of that water would be to that farmer who has no water per acre per year? . . . I think the value of the water to the person buying the water that could use it on the land adjoining this eighty acres to the north and to the west, if delivered to him without any other additional cost, that the water that could be delivered there would be worth about $15.00 per acre to that person." A motion to strike the answer was denied. "Q. (By Mr. Brittan): If confined to the eighty acre parcel of land if you owned the land what would you expect the reasonable rental value of that eighty acre parcel? . . . A. You. also mean if I owned *the pumping plants* and wells and improvements on it? (Italics ours.) Q. Yes. A. I think it is worth $15.00 per acre as rental value." A motion to strike this answer was also denied.

This is a general illustration of the evidence received and upon which the court allowed the judgment for damages in the sum of $25,000.

 The true criterion of rental value is not what the land or water would rent for under special or extraordinary circumstances or what its worth to the owner or to a particular occupant or to a particular person would be, but its fair rental value on the market when offered for rent under ordinary circumstances. (*Nathan* v. *Dierssen,* 164 Cal. 607 [130 Pac. 12].)

The lands adjacent, which were referred to in each of the questions above quoted, were the lands under lease to Samples. This was an inquiry into the value of the water to a particular occupant situated such as Samples was. It is plain from the testimony that the witnesses based their opinions mainly on incompetent and inadmissible matters and upon what Samples had been able to do on the whole property. They were basing their value mainly upon the peculiar situation of this particular land and the gross value of crops produced thereon by Samples, without considering the cost of production, planting, harvesting and sacks, and without considering the personal element of skill, industry and management. They were not giving opinions of market value or reasonable rental value on the market of the 80 acres here involved, together with the water thereon. The motions to strike portions of this evidence should have been granted. (*Reclamation District No. 730* v. *Inglin,* 31 Cal. App. 495, 500 [160 Pac. 1098]; *San Diego Land & Town Co.* v. *Neale,* 88 Cal. 50, 62 [25 Pac. 977, 11 L. R. A. 604].) Timely motions were made to strike the evidence of these witnesses for the reason that they were based upon what one man's industry and skill had been successful in producing and were, for many reasons, incompetent, irrelevant and immaterial. The rulings of the court in reference to a great portion of the evidence received, were prejudicial and must have resulted in the apparent excessive judgment rendered. (*Crow* v. *San Joaquin etc. Irr. Co.,* 130 Cal. 309, 314 [62 Pac. 562, 1058]; *Stockton & C. R. R. Co.* v. *Galgiani,* 49 Cal. 139, 140.) All these matters were called to the attention of the court on a motion for new trial and a request for a specific finding in reference to them was made. This request was refused by the trial court.

The judgment is unsupported by proper evidence, unsupported by proper findings, and appears to be excessive. It should be and is reversed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied April 23, 1942, and respondents' petition for a hearing by the Supreme Court was denied May 25, 1942.