[Civ. No. 3191. Fourth Dist. Apr. 8, 1946.]

LAURA B. EDGAR, as Administratrix etc., et al., Plaintiffs and Appellants, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), Respondent; CHARLES FIND-LAY et al., Defendants and Appellants.

John W. Preston and Jesse W. Curtis for Appellants.

Louis Ferrari, G. D. Schilling, U. A. Gribble, Harvey, Johnston & Baker and Erskine & Erskine for Respondent.

BARNARD, P. J.—The respondent bank, as trustee, held title to 80 acres of land without the right to sell or lease the same under the circumstances material here. The property was acquired in 1921 for a recited purchase price of $8,000 and for the next fifteen years it was rented only for grazing purposes, the rentals not exceeding the amount of the taxes. From 1932 to 1935 the taxes, averaging about $6.00 a year, were allowed to become delinquent.

In the fall of 1936, D. C. Scott and E. G. Stahl, believing they could develop water on this 80 acres, sought to buy that property and, as a part of the project they had in mind, also leased about 900 acres of adjoining and surrounding land at a rental varying from 50 cents to $1.00 per acre. In December, 1936, the respondent bank, in violation of its trust but in the belief that it owned the 80 acres, sold the same to Scott and Stahl for $800, payable in installments. The bank sold the surface rights only and there is no controversy respecting any possible oil rights, which were specifically reserved. Early in 1937 Scott and Stahl drilled two wells on the trust land, complete with casing, at a cost of $4,100. These wells produced about 1200 gallons of water per minute each, which proved sufficient to irrigate about 1000 acres of land. On March 1, 1937, Scott and Stahl leased the trust land and subleased the adjoining 900 acres of land to Sample Bros. for a period of five years and five months, expiring on August 1, 1942, with the right to use water produced on the 80 acres both on that land and on the adjoining 900 acres. The Samples agreed to and did pay Scott and Stahl a rental of $5.00 per acre per year for both the 80 acres and the 900 acres. They also agreed to pay the cost of drilling the wells, with the casing, these amounts to be deducted from the rentals due. They also agreed to operate the pumps and deliver the water to various portions of the land at their own expense. The Samples used the water so produced for that purpose until August 1, 1942, with great success and produced crops of

great value. It now appears that on the expiration of those leases Scott and Stahl acquired two 10-acre tracts adjoining the trust land on the north and on the south, and drilled thereon two wells from which the 900 acres were then irrigated.

On the discovery of its error in selling the land the bank began negotiations with Scott and Stahl in an effort to repurchase the 80 acres and have it restored to the trust. As a result, Scott and Stahl on March 10, 1938, gave the bank a quitclaim deed to the 80 acres, which deed contained the reservation that Scott and Stahl were to retain the use and occupancy of that land until August 1, 1942, and further provided that Scott and Stahl should pay to the bank $200 in cash and $400 on the first of August of each year from 1938 to 1941, both inclusive. It is admitted that pursuant to the latter provision $1,800 was paid to the bank. It clearly appears that by this deed the bank immediately reacquired no more than the legal title to the 80 acres, with a provision making possible the complete restoration of the property to the trust on August 1, 1942. It is admitted that the bank paid Scott and Stahl for this deed a net amount of $4,700 over and above the $800, for which it had originally sold the land.

On a former appeal (see *Edgar* v. *Bank of America,* 50 Cal. App.2d 827 [123 P.2d 885], where some of the facts are more fully stated), a judgment against the bank for $25,000 was reversed on the ground that it was based upon several measures of recovery without any election to rely upon any one of them in particular. It was there pointed out that, under section 2237 of the Civil Code, where trust property has been wrongfully disposed of by the trustee the beneficiaries of the trust may, at their option, either compel the trustee to replace the property "with its fruits" or compel the trustee to account for its proceeds with interest.

Thereafter, the plaintiffs, having elected to seek the restoration of the property with its fruits, filed an amended complaint in which they asked to have the 80 acres fully restored to the trust and to have the bank account to the trust for the value of the water and other fruits and products produced thereon between December 28, 1936, and August 1, 1942. The case was retried and the court found, among other things, that Scott and Stahl had retained possession of the 80 acres up to August 1, 1942; that the 80 acres had been enhanced in

value in the amount of $4,100, being the cost of the wells and casing; that the $1,800 paid to the bank by Scott and Stahl under the terms of the quitclaim deed was the reasonable rental value of the 80 acres as improved by the wells; that the only income derived by the bank from the 80 acres from December 28, 1936 to August 1, 1942, was this $1,800 paid under the quitclaim deed; and that the fruits of said land acquired by the bank from December 28, 1936, is the said sum of $1,800. As conclusions of law, it was found that the 80 acres should be restored to the trust; that the bank should restore and pay to the trust the fruits of the land it had thus received in the amount of $1,800, with interest thereon from August 1, 1942; that the bank has a lien on the 80 acres to secure the payment to itself of the sum of $4,100, being the amount which the value of the land had been increased by the improvements; that the $1,800 thus owed by the bank should be credited on the $4,100 thus owed to it; that the land should be sold and the balance due to the bank should be paid from the proceeds of the sale; and that the bank should recover its costs. Judgment was entered accordingly, with the appointment of a commissioner to sell the land. From this judgment the beneficiaries of the trust have appealed.

There is no dispute as to the general facts, and little, if any, dispute as to the general rule of law applicable. Both parties agree that by virtue of the election thus made the appellants are entitled to a restoration of the trust land with its fruits. There is a strong disagreement between them with respect to what may properly be considered as such fruits. Moreover, the appellants have conceded at the trial, and here, that the amount representing the fruits of this land for this period, to which they are entitled, should be reduced by the sum of $4,100 representing the amount by which the value of the land was enhanced through the installation of the wells. It may be observed, in passing, that this concession was rather liberal in view of the fact that, in the absence of other available land, these wells seem much larger than were needed for the 80 acres, and there was also some depreciation.

The land being returned and it being thus admitted that the appellants should be charged for the enhanced value of the land, the essential question here is as to what may be said to constitute the fruits of this land during the period from the date of the wrongful conveyance up to August 1, 1942, when possession was finally restored to the trustee. The main

controversy is over the question as to whether the water removed from the 80 acres and used on the 900 acres should be considered and accounted for as a part of the fruits of the 80 acres.

The appellants contend that the findings, to the effect that the $1,800 received by the bank was not only the reasonable rental value of the land but constituted its fruits for the period in question, are not supported by the evidence. It is argued that these findings fail to take into consideration the net value of the water produced on the 80 acres and taken to and used on the 900 acres; that it clearly appears that the $1,800 received by the bank does not include any part of the water thus removed from the 80 acres because that amount was fixed on the basis of $5.00 per acre per annum for the trust land, which was the precise amount paid as rental for the 900 acres; that this $5.00 per acre was paid for only a part of the period in question; that the water thus removed from the 80 acres was the principal and most valuable part of the fruits and products of the trust property; and that the net value of the water so taken from the trust land not only could be but was determined with absolute accurancy. In support of this last contention they rely on the books kept by Scott and Stahl showing their receipts and disbursements for the period in question, which were introduced in evidence. These books covered the entire enterprise, including both the trust property and the 900 acres. These books show that Scott and Stahl received during the five-year period some $25,000 from the Samples as rentals on both the 900 acres and the 80 acres at $5.00 per acre per year, and that after deducting the rentals and other expenses paid by Scott and Stahl, including the $1,800 paid to the bank, the balance of their net income from the project was $15,697.37. It is argued that this net income, thus received by Scott and Stahl, constitutes the fruits of the 80 acres for the period in question; that the $4,100 chargeable to the appellants for the improvements to the land and the $1,800 already paid to the trustee should be deducted from this amount; and that the balance of $9,797.37 is the net value of the water extracted from the trust property and is the amount for which the appellants should have judgment, in addition to the restoration of the land.

It is also argued that the appellants offered to prove by three witnesses that the reasonable market value of water in the vicinity of the trust land was at least $15 per acre per

annum, that this evidence was excluded, and that on the basis of this evidence it could have been established that the net value of the water taken from the 80 acres was more than $5.00 per acre per year, for the 900 acres.

The respondent, while admitting that under the circumstances the remedy of specific reparation became available to the appellants and that under their election they are entitled to a restoration of the property with its fruits, contends the rents paid it by Scott and Stahl (the $1,800 paid pursuant to the quitclaim deed) constitute the fruits of the 80 acres, and that this court so held on the former appeal. (50 Cal.App.2d 827.) It is argued that the quitclaim deed given to the bank by Scott and Stahl on March 10, 1938, was not only a reconveyance of the 80 acres to the bank but was also, in effect, a lease of the property by the bank to Scott and Stahl; that in order to reacquire the trust property the bank was compelled to permit Scott and Stahl to retain possession of the land up to August 1, 1942, (the expiration of their leases to the Samples); that Scott and Stahl would not have resold the property to the bank unless it had agreed to lease it to them for that period; that when the bank reacquired the property it again held it in trust "subject to appellants' right to reject the remedy of specific reparation and to elect one of their other remedies"; that the appellants, having elected to seek specific reparation, the restoration of the property with its fruits, must take under the situation as it then existed, and are entitled only to the rents which were paid to the bank by Stahl and Scott under the implied lease contained in the quitclaim deed, or the sum of $1,800, which constitutes the entire fruits of the property for the period in question. It is further argued that the appellants' real contention is that the bank was negligent in thus leasing the 80 acres to Scott and Stahl at too low a rental, that this issue was not pleaded, and that, in any event, there is evidence that the rent paid by Scott and Stahl for the 80 acres was its reasonable rental value and further evidence that after that lease expired on August 1, 1942, Scott and Stahl acquired two 10-acre parcels adjoining the trust property and drilled two new wells, from which they irrigated the 900 acres, which indicates that they would have refused to lease the 80 acres from the bank if the bank had sought to charge a higher rental therefor.

Both parties concern themselves with the "equities" of

the existing situation. In this regard it may be noted that under the judgment as entered the respondent, by deferring the time of possession, secured a final return of the property at a cost of $4,700, less a credit of $4,100 for improvements made by others, or a net cost of $600 to the bank for its mistake, including the delayed complete return of the property. On the other hand, the appellants, after crediting the $1,800 which was paid to the bank, must pay an additional $2,300 to get the property back into the trust. While it is said that they are now getting land with water instead of arid land they are not only paying for improvements but for unnecessarily large improvements. While they are compelled to accept for only a part of the time the same rental as that paid for the adjoining land without water, they have been deprived of the full use of the land during more than five years, during which its possession would apparently have been much more valuable to the appellants than it will now be. Moreover, the discovery of water on the land might well have occurred if the bank, instead of making its mistake and selling at so cheap a price, had made a lawful arrangement with Scott and Stahl or with someone else.

Turning more specifically to the contentions of the parties it rather clearly appears that those of neither party can be fully sustained. The $1,800 paid to the bank was not the full fruits of this land, and this court did not so hold on the former appeal. Scott himself testified that while $5.00 an acre was a reasonable rental for the whole 1,000 acres, it was "a pretty cheap price for that eighty acres." The quitclaim deed given to the bank in 1938 was not merely a reconveyance of the title and a new lease freely made. Not only did the bank have no right to make such a lease under the provisions of the trust, but it clearly appears, and it is admitted, that the bank was acting under compulsion in that regard. It thus secured a reconveyance at a much less figure than would otherwise have been possible and, by agreeing to the delayed possession, it actually received a value greatly in excess of the $1,800 which was paid to it in cash. The appellants' election to seek restoration of the property with its fruits was not dependent upon the situation thus again created by the bank. That election was not made until after August 1, 1942, when, for the first time, the bank was in a position when it could make a full restoration of the property.

That election related to the original wrongful sale of the land, and to the fact that restoration was then possible. Having so elected, the appellants were entitled both to restoration and to the actual fruits of the land for the full period until it was completely restored in 1942. The appellants were not attempting to change the issue to one of negligence on the part of the bank in leasing the 80 acres at too low a rental, and the issue pleaded and presented was with respect to what were the actual fruits of the land.

■ It appears without question that during this period Scott and Stahl actually furnished water produced on the 80 acres for the irrigation of the other 900 acres. While, as to them, it was a part of their entire deal, in practical effect they sold water produced on the 80 acres which was sufficient to irrigate the 900 acres. This was a product of the 80 acres, as much as was any rental received for the use of the surface thereof. The net value of what they received for this part of the water was a part of the actual fruits of the 80 acres during this period. This figure, when determined, should be added to the net returns received by Scott and Stahl as rentals for the use of the surface of this 80 acres in order to ascertain the actual fruits of this land.

■ While the appellants' contention, that the net value of the water produced on the 80 acres and used on the 900 acres should be considered as a part of the fruits of this land, must be sustained their further contention that this net value was accurately fixed by the books kept by Scott and Stahl is erroneous. These accounts cover the entire enterprise conducted by Scott and Stahl and the profit thus shown is the net return to them from the combined operation of both the trust property and the 900 acres. That figure, standing alone, obviously cannot be taken as indicating the net value of the water removed from the 80 acres. ■ It also appears that the court properly rejected the evidence which was offered to prove that the reasonable market value of water in the vicinity of the trust land was $15 per acre per annum. The issue here was as to what this land actually produced during the period in question, and what the water might have been worth to others was not material.

■ Restoration of the land, with its "fruits," requires, in addition to restoring the title, an accounting, on some basis, for what the land produced over the period in which the ap-

pellants were deprived of its possession. As was said in *Work* v. *County Nat. Bank & Tr. Co.,* 4 Cal.2d 532 [51 P.2d 90], "The alternative remedies . . . are all aimed to make the beneficiary whole. . . . The only way the trust properties can be 'replaced' is to permit the respondents to receive what they would have received had appellant been faithful to its trust." Obviously, what was received by the Samples from the use of the 80 acres is not the true test, as that would include the results of their work and skill in farming the land. Nor does the $1,800 paid to the bank represent the real fruits of the land for this period. That is merely an amount which the bank was compelled to accept because of the situation resulting from its own error. Moreover, that is not all the bank received. It received an additional value through regaining the title on favorable terms, by further deferring possession and use of the land.

Under the circumstances here, the true test as to what were the fruits of this land during this period is what it produced for those to whom it had been wrongfully conveyed, and who stood in the position that the appellants should have occupied. The "fruits," with which we are here concerned, is the net amount produced from the 80 acres and received by Scott and Stahl, who actually exercised the rights of ownership during that period. What they were able to do with the land, and what they received for the use thereof, constitutes the actual production and fruits of the land. This cannot fairly be measured by the $5.00 per acre rental paid to them for that land, along with the other 900 acres. The 80 acres, with its supply of water, produced much more than a proportionate share of the total return. The water taken for use on the other land was an important part of that return and of the fruits of the 80 acres.

The net value or return to Scott and Stahl from the water thus removed from the 80 acres should have been determined and included as one of the fruits of the property. This net return from a specific operation which was carried out is such part of the $5.00 per acre per annum which Scott and Stahl actually received as rental for the 900 acres, less their expenses, as should properly be credited to the water taken from the 80 acres while allowing a proper proportion to the use and productivity of the 900 acres, since both elements contributed to the net profits realized by them on the entire deal.

This figure, when determined, should have been added to the net amount received by Scott and Stahl as rental for the surface of the 80 acres. (Apparently this rental was $2,000 and not $1,800.) From this total should have been deducted the amount by which the value of the 80 acres was enhanced through the improvements made. The remainder, with a proper allowance for interest, would constitute the fruits of this land to which the appellants were entitled.

There is no evidence in the record from which the net value of the water taken from this 80 acres, as thus indicated, can be determined. That value is one which must be established in the trial court. The cause should be retried on the real issues presented by the pleadings and not on the exact theories here presented by either side, neither of which is fully sustainable.

.After this cause was argued the parties filed a stipulation as to certain facts, with the further stipulation that it should be considered as a part of the record on appeal, subject to an objection by the appellants that these matters are incompetent, irrelevant and immaterial on this appeal. It appears therefrom that some nine months after this judgment was entered an agreement was reached by which the bank, with the consent of the beneficiaries, conveyed the surface rights in the 80 acres to D. C. Scott; that Scott paid the beneficiaries $10,000; that Scott was also to deposit $5,500 in escrow to be used to pay any amount finally adjudged in this action to be due to the bank; that the making of the stipulation is not to prejudice the right of the beneficiaries to prosecute to a final conclusion their claims against the bank by reason of its breach of trust; and that the judgment shall be deemed to have been executed solely to the extent that the real property shall be deemed to have been restored to the trust and to be now held by the bank as trustee.

The appellants have since filed, without a stipulation making this a part of the record, two affidavits stating that Scott did not deposit the $5,500 above referred to, and that by subsequent agreement of all parties $5,500 of the $10,000 purchase price is being retained by the title company to abide the final result of this action and to cover any amount that may ultimately be found due to the bank.

The respondent, in a supplemental brief, argues that these facts show the value of the land as finally returned to the trust and have a bearing upon the equities of the situation.

It is also argued that these facts render moot the question raised as to whether the bank was entitled to a lien on the 80 acres to secure the payment of the amount of its judgment.

Not only has this entire matter no important bearing here, but the question raised as to this lien, and a further question with respect to costs in the trial court, require no consideration here since the judgment must be reversed.

The judgment is reversed and the cause remanded for another trial.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing was denied April 26, 1946, and respondent's petition for a hearing by the Supreme Court was denied June 6, 1946.