[Civ. No. 4060.    Fourth Dist.    Mar. 7, 1951.]

LAURA B. EDGAR et al., Plaintiffs and Appellants, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), Respondent; CHARLES FINDLAY et al., Defendants and Appellants.

John W. Preston and Henry C. Mack for Appellants.

S. B. Stewart, Jr., G. D. Schilling, U. A. Gribble, Johnston, Baker & Palmer and Erskine, Pillsbury & Tulley for Respondent.

MUSSELL, J.—In 1921 the plaintiffs purchased 80 acres of land situated in Kings County, California, for the sum of $8,000.  Because there were some 30 or more purchasers, the title was conveyed to Security Trust Company to hold under a trust agreement.  The agreement provided that the trustee could not sell or lease without the consent of 51 per cent of

the beneficial interests. Defendant Bank of America thereafter succeeded to all of the rights, duties and liabilities of the Security Trust Company as trustee. From February, 1921, until December, 1936, the property was rented by plaintiffs, whenever it could be, for grazing purposes and the rentals received by them did not exceed the amount of the taxes. The taxes for the years 1932 to 1935, inclusive, were allowed by plaintiffs to become delinquent. These taxes were paid by the bank on January 5, 1937, and during the years 1933, 1934 and 1935 no rental money was received by the beneficiaries from grazing.

In the fall of 1936, D. C. Scott and E. G. Stahl, believing that they could develop water on this 80 acres, sought to buy the property and also leased about 900 acres of adjoining and surrounding land at a rental of from 50 cents to $1.00 per acre. In December, 1936, the defendant bank, in violation of its trust, but in the belief that it owned the 80 acres, sold the same to Scott and Stahl for $800, payable in installments, reserving the oil rights. Early in 1937, Scott and Stahl drilled two water wells on the trust land, complete with casing, at a cost of approximately $4,305. These wells produced about 1,200 gallons of water per minute each, which proved sufficient to irrigate about 1,000 acres of land. When water was developed on the 80 acres on March 1, 1937, Scott and Stahl leased the trust land and subleased the adjoining 900 acres to Sample Bros. for a period of five years and five months, expiring on August 1, 1942, with the right to use water produced on the 80 acres, both on that land and on the adjoining 900 acres. The Samples agreed to and did pay Scott and Stahl a rental of $5.00 per acre per year for both the 80 acres and the 900 acres. They agreed to pay the cost of drilling the wells, with the casing, these amounts to be deducted from the rentals due. They also agreed to operate the pumps and deliver the water to various portions of the land at their own expense. The Samples used the water so produced until August 1, 1942, and raised valuable crops on the property. After the leases had expired in 1942, Scott and Stahl acquired two 10-acre tracts adjoining the trust land on the north and on the south and drilled thereon two wells from which the 900 acres were then irrigated.

In October, 1937, one of the beneficiaries discovered that extensive farming operations were being conducted on the 80 acres. This was reported to the bank and an investigation was made. Immediately upon discovery of the bank's error

in selling the trust property, the oil, gas and mineral rights were restored to the trust. Negotiations were then conducted by the bank, which, on March 10, 1938, resulted in a repurchase of the 80 acres by the bank, subject to a reservation in the deed from Scott and Stahl, reserving unto them the use and occupation of the 80 acres until August 1, 1942, on the payment by them of $200 cash and $400 annually, beginning with the 1st day of August, 1938 to and including August 1, 1941. The water wells and casings were to be maintained in good condition, reasonable wear and tear excepted, and delivered to the bank at the end of the term. The repurchase price paid by the bank for the property, subject to the reserved use, was the cancellation of the balance of $500 owing on account of the original purchase price from Scott and Stahl and the further sum of $5,000 cash. This valuation of $5,500 was predicated on the amount that Scott and Stahl had paid for the property and the cost of drilling and equipping the wells with casings.

The instant action was originally brought by the beneficiaries of the trust against the trustee for damages for the use, occupancy, rents, issues and profits of the trust property which the trustee had sold without obtaining the written consent of the beneficiaries as provided in the trust agreement. On a former appeal (*Edgar* v. *Bank of America*, 50 Cal.App. 2d 827 [123 P.2d 885]) a judgment against the bank for $25,000 was reversed on the ground that it was based upon several measures of recovery without any election to rely upon any one of them in particular. It was there pointed out that under section 2237 of the Civil Code, where trust property has been wrongfully disposed of by the trustee, the beneficiaries of the trust may, at their option, either compel the trustee to replace the property ''with its fruits'' or compel the trustee to account for its profits with interest. Thereafter, the plaintiffs, having elected to seek the restoration of the property with its fruits, filed an amended complaint in which they asked to have the 80 acres fully restored to the trust and to have the bank account to the trust for the value of the water and other fruits and products produced between December 28, 1936, and August 1, 1942. On the second trial of the case, the trial court, sitting without a jury, held that the trustee had restored the trust property to the trust and that the fruits thereof were the rents paid by Scott and Stahl to the trustee bank in the total amount of $1,800 and rendered judgment accordingly. Plaintiffs appealed and that

judgment was reversed by this court. (*Edgar* v. *Bank of America,* 73 Cal.App.2d 871 [167 P.2d 509].)

Upon the second appeal, this court held that the water taken from the trust land and used to irrigate the 900 acres of adjoining lands was part of the actual fruits of the trust property and that the trustee must account for the ''net value'' of what Scott and Stahl received therefor. In commenting upon the situation, this court said in *Edgar* v. *Bank of America,* 73 Cal.App.2d 871, 874 [167 P.2d 509] :

''The land being returned and it being thus admitted that the appellants should be charged for the enhanced value of the land, the essential question here is as to what may be said to constitute the fruits of this land during the period from the date of the wrongful conveyance up to August 1, 1942, when possession was finally restored to the trustee. The main controversy is over the question as to whether the water removed from the 80 acres and used on the 900 acres should be considered and accounted for as a part of the fruits of the 80 acres.

. . . . . . . . . . . . .

''Restoration of the land, with its 'fruits,' requires, in addition to restoring the title, an accounting, on some basis, for what the land produced over the period in which the appellants were deprived of its possession. As was said in *Work* v. *County Nat. Bank & Tr. Co.,* 4 Cal.2d 532 [51 P.2d 90], 'The alternative remedies . . . are all aimed to make the beneficiary whole. . . . The only way the trust properties can be ''replaced'' is to permit the respondents to receive what they would have received had appellant been faithful to its trust.' Obviously, what was received by the Samples from the use of the 80 acres is not the true test, as that would include the results of their work and skill in farming the land. Nor does the $1,800 paid to the bank represent the real fruits of the land for this period. That is merely an amount which the bank was compelled to accept because of the situation resulting from its own error. Moreover, that is not all the bank received. It received an additional value through regaining the title on favorable terms, by further deferring possession and use of the land.

''Under the circumstances here, the true test as to what were the fruits of this land during this period is what it produced for those to whom it had been wrongfully conveyed, and who stood in the position that the appellants should have occupied. The 'fruits,' with which we are here concerned,

is the net amount produced from the 80 acres and received by Scott and Stahl, who actually exercised the rights of ownership during that period. What they were able to do with the land, and what they received for the use thereof, constitutes the actual production and fruits of the land. This cannot fairly be measured by the $5.00 per acre rental paid to them for that land, along with the other 900 acres. The 80 acres, with its supply of water, produced much more than a proportionate share of the total return. The water taken for use on the other land was an important part of that return and of the fruits of the 80 acres.

''The net value or return to Scott and Stahl from the water thus removed from the 80 acres should have been determined and included as one of the fruits of the property. This net return from a specific operation which was carried out is such part of the $5.00 per acre per annum which Scott and Stahl actually received as rental for the 900 acres, less their expenses, as should properly be credited to the water taken from the 80 acres while allowing a proper proportion to the use and productivity of the 900 acres, since both elements contributed to the net profits realized by them on the entire deal. This figure, when determined, should have been added to the net amount received by Scott and Stahl as rental for the surface of the 80 acres. (Apparently this rental was $2,000 and not $1,800.) From this total should have been deducted the amount by which the value of the 80 acres was enhanced through the improvements made. The remainder, with a proper allowance for interest, would constitute the fruits of this land to which the appellants were entitled.''

█ Under this state of the record, the cause was remanded for a third trial, at which the trial court determined that the fruits of the trust land could best be ascertained by applying the crop share rental rule as between landlord and tenant, to wit: that where land is leased without water, the landlord receives one-fifth of the crop and with water available, receives one-fourth of the crop. The court, in elaborate findings, found, among other things, that the ''fruits'' for which the said bank should account were the rents of said land (the 80 acres) paid by Sample Bros. to said grantees from December 28, 1936, to August 1, 1942, plus the net return to said grantees during said period from the water removed from the said lands (the 80 acres) and used to irrigate said adjoining 900 acres. ''Said net return of said grantees from said water was their net return from said adjoining 900 acres, less the

proportion of said net return from said adjoining 900 acres which should be allocated to the use and productivity thereof. The proportion of said net return from said adjoining 900 acres which should be allocated to the use and productivity thereof is 80% of said net return, and the proportion of said net return which should be allocated to said water from said land (the 80 acres) used to irrigate said 900 adjoining acres is 20% of said net return." The court then set forth figures showing the total fruits of the said land for the five-year period involved as being the sum of $7,362.54. He then deducted from this total the sum of $1,614.35 for permanent improvements to the land and interest on this amount in the sum of $776.59 and entered judgment that the plaintiffs recover from the said bank a net amount of $4,971.60.

The question now before us is whether this judgment is supported by substantial evidence.

It is apparent that there is no fixed rule set forth in the previous opinions on appeal herein by which the proportion of "fruits" of the water taken from the 80 acres and used on the adjoining land can be ascertained. The determination of that question was for the trial court upon the evidence presented. The court apportioned the net received by Scott and Stahl from the 900 acres to the land and water upon the analogy of a crop lease, stating that such an analogy was the "soundest method of determining the proportion of the agricultural production allocable to the land and the proportion allocable to the water." The application of this theory resulted in a judgment allowing 20 per cent of the net return to the water and 80 per cent to the use and productivity of the adjoining land. The allocation thus made, whether under the theory of a crop lease or not, if reasonable under all of the circumstances shown, and supported by substantial evidence, cannot be here disturbed. (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689]; *Dillard* v. *McKnight*, 34 Cal.2d 209, 223 [209 P.2d 387, 11 A.L.R.2d 835].)

There was a conflict in the evidence as to the correct division of the "fruits" of the water and of the adjoining land. Mr. Holley, a qualified civil and hydraulic engineer, on behalf of the defendant, testified that he had made a considerable survey of the premises involved; that, assuming that the net return of Scott and Stahl for a five-year, five-month period, ending on August 1, 1942, from the 900 acres, was as testified to by Mr. Stahl, from $2.50 to $3.00 per acre per year, the proportion

that should be allocated to the water taken from the 80 acres and the proportion allocable to the use and productivity of the 900 acres should be about one part to the water and four parts to the land; that his opinion was based on his knowledge and observation; that the two wells on the 80 acres might just as well have been placed on the 900 acres; that in his opinion wells sunk on the 900 acres would have produced water at the same reasonable cost as the wells on the 80 acres; and that the reasonable cost of the equipped wells bears a direct relation to the value of the water which he apportioned between the water and the land, one to four.

Mr. Hunt, who had been occupied in appraisement work in Kern county since 1934, testified that the net return from the 900-acre tract should be apportioned four parts to the land and one part to the water; that over a period of years he had noticed that the rental rates on land in this particular end of the valley had been based on a one-fifth of the crop to the landowner as a general rule where water was not developed on the land; that in any event, the value of the water should not be more than the cost to develop it.

Mr. Moore, a real estate broker of 38 years' experience, and a resident of Kern County for about 55 years, testified that he was familiar with the rental of irrigated lands where equipped wells were being furnished by the landowners and where equipped wells were furnished by tenants; that he had made an examination of the premises; that he would apportion the net return from the water and the land, one-fifth to the water and four-fifths to the land.

Mr. Hobson, a certified public accountant with 30 years' experience, testified that an allocation made in accordance with accounting principles should be upon the basis of costs, not values; that the gross amount received by Scott and Stahl from their project arose from three elements—land, water and management; that he had determined the cost of the land to Scott and Stahl, the cost of the water and of management and that the net should be allocated as follows: $47\frac{1}{2}$ per cent to the land, $22\frac{1}{2}$ per cent to the water and 30 per cent to management. In this connection, it may be observed that the allocation on the basis of a crop lease is substantially the same as the result obtained by Hobson's method of accounting and apportionment.

One of·the circumstances supporting the conclusion of the trial court is that when Scott's lease of the 80 acres expired on August 1, 1942, he purchased a 10-acre parcel directly

south and a 10-acre parcel directly north of the 80 acres, and that he drilled a well on each of these 10-acre parcels and produced water in substantially the same quantities as produced by the first two wells. It is apparent, therefore, that water could have been produced on the 900 acres as well as on the 80. Under such circumstances, a much greater proportion of the net fruits of the land and water should be allocated to the land than to the water.

After reviewing the foregoing testimony and other evidence received in support of the judgment, we cannot say as a matter of law that there was no substantial evidence to support the judgment. While there was evidence contradicting the testimony of witnesses for defendant, it merely created a conflict which the trial court determined in favor of the defendant. ■ It is not the province of this court to determine conflicts in the evidence, nor to choose between different inferences which may be drawn from the testimony. (*People* v. *Hills,* 30 Cal.2d 694, 701 [185 P.2d 11].)

As was said in *Fackrell* v. *City of San Diego,* 26 Cal.2d 196, 207 [157 P.2d 625, 158 A.L.R. 625] :

''The findings of the trial court must be sustained if they are supported by substantial evidence. All legitimate and reasonable inferences must be indulged toward upholding the findings. Appellate courts, if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical. (*Estate of Bristol* (1943), 23 Cal.2d 221, 223 [143 P.2d 689].)''

The judgment of the trial court appears to us to be a practical and equitable solution of the problem presented. It appears that pursuant to a stipulation of the parties, the surface rights in the 80 acres, exclusive of the oil, gas and mineral rights, are to be conveyed to Scott for the sum of $10,000. Plaintiffs then, under the judgment, receive this amount for the land; they retain their mineral rights; and in addition, recover $4,971.60. We cannot say that such a disposition of the controversy is unreasonable and unsupported by the evidence in view of the entire record before us.

Judgment affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied March 28, 1951.