[L. A. No. 18641. In Bank. Dec. 1, 1943.]

Estate of LUTHER BRISTOL, Deceased. AGNES BRISTOL, Appellant, v. EDITH YOUNG, Respondent.

Jacob Forst and W. P. Smith for Appellant.

Don Lake and Charles G. Young for Respondent.

SCHAUER, J.—The controlling question on this appeal is the sufficiency of the evidence to support the finding of the trial court that ''the deceased never cancelled or destroyed

the codicil of April 28th, 1941, and said codicil was in existence at the time of his death.'' The contest is purely one of presumptions and inferences. That the codicil was duly executed is established without question but, after the testator's death, it was never found. No witness was produced who claimed (or admitted) to have seen such lost codicil after the day of its execution nor, on the other hand, to have seen the testator destroy it or to have heard him declare that it had been revoked. There is evidence which, on the cold pages of the record, appeals to reason as supporting the conclusion that the codicil was destroyed by the testator, but a critical consideration of the entire record impels us to the conviction that the circumstances depicted are not devoid of substantially conflicting inferences. The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. (*Estate of Snowball* (1910), 157 Cal. 301, 305 [107 P. 598]; *Estate of Barr* (1924), 69 Cal. App. 16, 33 [230 P. 181].) The rule as to our province is: ''In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.'' (Italics added.) (*Crawford* v. *Southern Pacific Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183].) The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict. The critical word in the definition is ''*substantial*''; it is a door which can lead as readily to abuse as to practical or enlightened justice. It is common knowledge among judges and lawyers that many cases are determined to the entire satisfaction of trial judges or juries, on their factual issues, by evidence which is overwhelming in its persuasiveness but which may appear relatively unsubstantial—if it can be reflected at all—in a phonographic record. Appellate courts, therefore, if there be any

reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical. Upon such view of the law we cannot hold that any essential finding in this case is unsupported.

Appellant-contestant relies upon the rule stated in section 350 of the Probate Code that "No will shall be proven as a lost or destroyed will unless proved to have been in existence at the time of the death of the testator, or shown to have been destroyed fraudulently or by public calamity in the lifetime of the testator, without his knowledge," and upon the presumption which has been declared by this court (*Estate of Sweetman* (1921), 185 Cal. 27, 28 [195 P. 918]; *Estate of Johnston* (1922), 188 Cal. 336, 340 [206 P. 628]), and which is well stated in 26 California Jurisprudence 807, section 141, that "Where the evidence shows that the instrument cannot be found, and that when last seen or known to exist it was in the custody or possession of the decedent, the conclusion of law is that the writing was destroyed by the decedent, and that he acted with the intention of effecting a revocation thereof." Presenting the other side of the controversy, respondent calls attention to the legal proposition that the burden of proof was on appellant-contestant and urges that the circumstances shown are sufficient to at least balance, and therefore to overcome, the presumption invoked by appellant, through raising inferences that the decedent never destroyed or revoked the codicil, that he believed at the time of his last illness that it was still in existence, and that in fact it was in existence at the time of his demise.

It should be noted that the above-quoted presumption which is relied upon by appellant-contestant is qualified by the further statement in 26 California Jurisprudence at page 807, in section 141, that "*Nothing else appearing*, the admission of the writing to probate as a lost or destroyed will must be denied. However, the proponent may secure the admission of the instrument by presenting evidence which rebuts the conclusion or presumption that arises from the facts of possession by the decedent and loss or disappearance. . . . It follows that the proponent is entitled to a favorable decree where he presents evidence showing that it is *equally*

*probable* (1) that the will was destroyed by another person than the decedent, or (2) that the act was not done with an intention to revoke the instrument.'' (Italics added.)

The mooted codicil was referred to by the parties throughout the trial as the ''lost codicil'' and will be so designated in this opinion. Viewing the evidence in aspects most favorable to sustaining the attacked finding (*Von Breton* v. *Hicks* (1942), 55 Cal.App.2d 909, 912 [131 P.2d 560]), the facts appear as hereinafter narrated.

Luther Bristol successfully raised a family of five children, including four sons and one daughter, Edith Bristol Young, the respondent-proponent herein, and accumulated a modest fortune. Late in life, apparently having lost his first wife, the mother of his children, he took to wife Agnes Bristol, many years his junior. This latter marriage did not produce an altogether harmonious union. It was punctuated by a separate maintenance action filed by Agnes, by a cross-complaint for divorce filed by Luther, by an amended complaint on the part of Agnes also seeking a divorce, and by a rescission suit instituted by Luther in which he sought to recover from Agnes certain income-producing real property which he had deeded to her. The divorce litigation ended in an impasse in which neither party was granted a decree and the rescission action was dismissed in reliance upon a false representation by Agnes which will shortly be referred to again. The principal result of the controversy being litigated is the determination of whether Agnes, the widow, or Edith, the daughter, shall administer the affairs of the estate, and whether a crippled granddaughter, Rita, who appears to have been definitely in Luther's affections, shall inherit a share of the estate.

Luther died on September 30, 1942, at an age of more than ninety-three years. Three testamentary documents are involved in the proceedings: (1) a ''Last Will and Testament of Luther Bristol,'' dated April 1, 1938, executed when the testator was approximately ninety years of age (and apparently shortly after the marriage to Agnes, the exact date of which does not appear); (2) a ''Codicil to My Will Dated April 1, 1938,'' itself bearing the date of July 28, 1939; and (3) the lost codicil, dated April 28, 1941. Another instrument, admittedly lacking testamentary competence, was found typed on the first codicil. It was prepared and typed by a

notary public who thus futilely assumed to engage unlawfully in the practice of law, but aside from some possible evidentiary value in the proof of intent—which the trial court found nonpersuasive—it has no significance here.

There is no contest as to the will of April 1, 1938, nor as to the codicil of July 28, 1939. The issue is joined solely as to the codicil of April 28, 1941—the "lost codicil." And it is not as to the fact of its original due execution but only as to the fact of its existence at the time of Luther's death that there is conflict. By the original will of April 1, 1938, Agnes, the newly acquired wife, was nominated executrix without bond, she was devised certain income-producing real property improved with a four-unit flat building and a single family residence, and, with the testator's children, was made a residuary legatee. The codicil of July 28, 1939, revised the original will (of April 1, 1938) only as to provision for the testator's son Walter and his granddaughters Ruth and Bernice Olsen. It does not affect the interests of either Agnes Bristol or Edith Bristol Young and has no significance in the litigated controversy except as it may tend to depict the scrupulous care and concern which the testator manifested for his own children and their children.

The lost codicil (of April 28, 1941), however, effects substantial changes in the testamentary plan. Subsequent to execution of the original will of April 1, 1938, and the first codicil of July 28, 1939, Mr. Bristol had deeded to Agnes the real property which had been the subject of his testamentary devise to her, and he had learned that his beloved granddaughter, Rita Fox, was not deceased, as had been believed at the time of execution of the earlier documents. (Rita had disappeared and remained absent from her family without communicating with them for an extended period; she returned prior to execution of the lost codicil.) The lost codicil revoked the provision of the original will devising to Agnes the subsequently deeded property, revoked the nomination of Agnes to act as executrix without bond, nominated Edith Bristol Young as executrix in place of Agnes, and added the name of Rita Fox (daughter of the testator's son Walter Bristol) to those of the granddaughters designated in the codicil of July 28, 1939, to share in the remainder of the limited devise to Walter. The original will also made testamentary disposition of certain parcels and items of property to the several children and various grandchildren, and it

appears that deeds conveying the real property to the children in general accord with the testamentary plan were also prepared and signed but were not delivered during the testator's lifetime. Such deeds, together with the original will and first codicil (and the abortive attempt at a codicil typed on the first codicil by the notary public) were found in the testator's safety deposit box after his demise. The lost codicil, so far as appears, was never placed in the safety deposit box. It was last seen, so far as claimed or admitted by any witness, at the time the testator placed it in his pocket after its execution.

The evidence tends to show that Mr. Bristol, after executing the lost codicil, never changed his mind as to providing for Rita, the returned granddaughter, or as to revoking the devise of the income property which had been deeded to Agnes, or as to appointing the daughter, Edith Bristol Young, as executrix. Mr. Bristol apparently was of sound and disposing mind up to within a few hours of his death.

Until a few days before his passing, Mr. Bristol kept on his body a money belt in which he had deposited $5,950. This money at that time, in his presence, by his direction, and in the presence of others of the family, was handed to Mr. Charles G. Young, the husband of Edith, and a member of the bar, for safekeeping. While no oral statement was made specifying in words that this money was entrusted to Mr. Young because his wife (Mr. Bristol's daughter) Edith was, by the terms of the lost codicil, to be the executrix of Mr. Bristol's will, the reticence of those participating in the conversation to speak bluntly concerning such matters at that time is easily understandable and the inference which the trial judge drew from the circumstances, to the effect that such was the object, the intent, and the understanding of the parties, is a reasonable one.

It is noteworthy that the petition for probate of the lost codicil expressly charges that such lost codicil "has never been revoked and was in existence at the time of the testator's death, but was destroyed and petitioner alleges on information and belief that *said codicil was destroyed by Agnes Bristol*, the surviving wife of the deceased." (Italics added.) Nowhere in the record does it appear that Agnes as a witness expressly or specifically or directly denied this charge. There is testimony that at a time eight days before Mr. Bris-

tol's death, during his last illness, and after members of his family had been called to his bedside, Agnes said "if she could ever get her fingers on the will and the deeds she would tear them all up except Walter's."

That Agnes had knowledge of the lost codicil, and of its contents and potential effect, is established. Mr. Bristol himself, in the presence of his attorney, told her that he had "changed" his will and that "Edith is going to be the executrix." He said to her: "Why, Mrs. Bristol, you would not put a loan on this property? . . . I have given you that, and *that is all you are going to get out of my estate . . . I have told you that I have changed my will, and that Edith is going to be the executrix,* and that you are to have the property to provide for yourself the rest of your life . . . *If you are going to make a loan on that property, I will not permit Mr. Lake to dismiss this case."* (Italics added.) While some of the testimony of Agnes appears to have been positive and emphatic to the degree of the dramatic, that pertaining to her knowledge of the lost codicil apparently was neither positive nor convincing to the trial judge. By way of illustration the following questions and answers are informative:

"Q. And did you ever see either in my office or in the possession of Mr. Bristol or about the home of yourself and Mr. Bristol, a codicil to his will which had been prepared by me?

"A. I don't *think* I have, Mr. Lake.

"Q. In other words, as far as you now recall you never saw that document at any time?

"A. I do not *think* so." (Italics added.)

To an extent seldom seen in a record, that before us in this case discloses on the part of Agnes Bristol, as a witness, an apparent determination to evade direct and forthright answers to pertinent questions. Repeatedly, through many pages of transcript, the trial judge is shown to have patiently and diligently, and by necessity, admonished her to answer directly and responsively material questions properly addressed to her. The recitals as to money and property which Agnes procured from Mr. Bristol at the time of and after her marriage to him, and the method she employed on one occasion, leave no doubt as to the legal sufficiency of the evidence to support a possible conclusion of the trial judge that the procurement of money and property from Mr. Bris-

tol was a motivating influence in Agnes' life and that she would not necessarily permit compunctions of honesty to deter her pursuit of the end sought.

The title to the income property which Mr. Bristol deeded to Agnes was clear and apparently he was insistent that it be kept clear of encumbrances. She also promised that she would not sell the property. When questioned as to whether she had falsified to Mr. Bristol concerning the procurement of a loan on this property contrary to his admonitions, Agnes at first denied that she had placed an encumbrance upon it. She testified, "I did not, I sold it, I didn't put a loan, I sold it." The following questions and answers then appear:

"THE COURT: The question is, did you tell your husband that you were or were not putting a loan on it, what did you tell your husband about a loan?

"A. I put a loan on first, and then I saw that I would lose the property, I could not make expenses and I sold it.

"Q. BY MR. LAKE: . . . My question is, at the time that you came to my office for me to sign this dismissal, when I told Mr. Bristol that you were trying to put a loan on the property, isn't it a fact that you turned to him and said, 'I am not, I have no intention of putting a loan on this property'?

"A. Well, I did not at that time, because there was already a loan on it, Mr. Lake.

"Q. I am not questioning whether or not there was a loan, did you tell Mr. Bristol that you had no intention of putting a loan on this property?

"A. Yes."

The object of the deceit disclosed by the above-quoted questions and answers becomes the more apparent upon mention of the fact that, as disclosed by the record, the object of the call of Agnes and Luther Bristol at the office of his attorney, when the quoted conversation took place, was to secure a dismissal of the rescission suit which had been filed by Mr. Bristol and which clouded the otherwise clear title of Agnes to the property. Agnes' application for a loan on the property was then pending and the title company had requested the dismissal of the suit with its accompanying notice of *lis pendens*. Mr. Bristol had no knowledge of the real object of Agnes in seeking the dismissal, and in reliance upon her disavowal of intent to hypothecate the property, in-

structed his attorney to dismiss the suit. The dismissal was filed. The loan was effected.

Concerning the subsequent sale of the hypothecated property the testimony of Agnes is on the same plane. She at first asserted that she had sold it for "about $4000" and under the probing of cross-examination finally admitted receiving a price of $5,500 for it. Her testimony concerning the regard and intentions of Mr. Bristol for his granddaughter Rita is also enlightening. It will be recalled that neither in the original will nor in the first codicil was any provision made for Rita, it being believed that she was no longer living. *Only in the lost codicil, executed after her return, does her name appear.* The significant testimony is as follows:

"Q. Did you ever hear Mr. Bristol say anything about Rita Fox, that he wanted her to be a beneficiary under his estate?

"A. She is one of his granddaughters.

"Q. That is not what I asked you, did you ever hear him say that he wanted her to participate in the distribution of his estate?

"A. Yes, sir.

"Q. And you also heard the conversation that he had with his daughter, Edith, before his death, in which he told her, and there was some discussion about him including Rita as a beneficiary in his estate, wasn't there?

"A. Yes.

"Q. And he mentioned the fact that he had included her as one of the beneficiaries, didn't he?

"A. Sure.

"Q. And you knew that right up to the time of his death, that that was his thought and that was his desire, that Rita would benefit, isn't that right?

"A. Well, she is his great-granddaughter [*sic*]."

The above-quoted testimony obviously depicts a state of mind of the testator which the trial judge could well have concluded was consistent only with the lost codicil's being, in Luther's belief, unrevoked and potentially operative. There is other evidence in the record, cumulative or corroborative in effect, which likewise tends to show the propensities of Agnes Bristol and the interests of Luther Bristol, but enough has been delineated to require us to hold that the determination

of the trial court was based on substantially conflicting inferences and hence is conclusive.

The judgment of the trial court is affirmed.

Gibson, C. J., Shenk, J., and Carter, J., concurred.

TRAYNOR, J.—I dissent. There is no evidence in the present case to support the finding that the codicil was in existence at the time of the testator's death. No one saw the codicil after its execution and delivery to the testator on April 28, 1941. It did not appear amongst the papers that the testator kept in his safe-deposit box in which was found after his death, the will of April 1, 1938, a codicil of July 28, 1939, a so-called "Second Codicil" not legally executed, and deeds to his children. There is no explanation for its disappearance between the time of its execution and the death of the testator. No claim is advanced that it was destroyed by public calamity, and any contention that the appellant fraudulently destroyed it in the testator's lifetime is dispelled by the trial court's finding that it was in existence at the time of his death.

The respondent relies upon evidence with regard first to a conversation between herself and the testator concerning Rita Fox, then to the delivery of testator's money belt to respondent's husband, and finally to a conversation between appellant and Mrs. Della Bristol, to prove the existence of the codicil at the testator's death.

In the first codicil the testator's son Walter was given a life estate in certain real property, with remainder to two of Walter's daughters. A third daughter, Rita, who had disappeared and not been heard from, was not given an interest in the remainder in view of the understanding, that her two sisters would execute an agreement giving her an equal interest should she return. Rita returned and the lost codicil gave her an interest in the remainder equal to that of each of her two sisters. Some time after the execution of this codicil respondent had a conversation with the testator, as to which respondent testified as follows: "Q. What did he say? A. Well, he said, 'I must fix it so Rita can get hers,' and I said, 'Why, dad, don't you remember, you had Mr. Lake fix that up.' He said, 'Oh, I had forgotten all about it.' He was getting very forgetful, he could not seem to remember

those things. Q. That was two months prior to his death? A. Yes, two or three months. Q. Could it have been as early as February of this year? A. Well, it might have been, it was February—I was over there February 20th, my son was home on furlough and he and I went over to see his grandpa. Q. Then when is the next time you went over? A. I went over about every two or three weeks. Q. Your recollection is now that this conversation about Rita Fox took place—— A. After February. Q. And about two months before September 30th? A. Well, it might have been longer, it is in there between those dates. Q. By THE COURT: What was it you said about the matter having been taken care of for Rita? A. You see, she had disappeared and he had forgotten that he had Mr. Lake fix up that codicil naming her, and he said, 'Did Charley ever have those girls sign a paper that would give her her share?' He said, 'I want her to have her share.' And I said, 'Why, Dad, you had that fixed up in Mr. Lake's office.' Q. What did he say about it? A. He just said that he had forgotten about it, that he wanted to make sure that Rita was going to get her part of it. Q. By MR. LAKE: And when you mentioned the fact that he had taken care of it in my office, what did he say? A. Just that it had slipped his memory, that he had forgotten all about it.''

This evidence given its utmost weight would prove only that the testator believed that the codicil was in existence at the date of the conversation some two or three months before his death. It in no way proves that the codicil was in existence when the testator died, or even that at any time after the conversation he did not revoke the codicil.

The testator at all times wore a belt containing a large sum of money. Two or three days before his death, after respondent had warned him of the danger of keeping the money belt on, the testator delivered it to respondent's husband, Mr. Charles G. Young, for safekeeping. Mr. Young placed the money in his safe-deposit box and properly accounted for it after the testator's death. There is nothing in this evidence that has any bearing upon the existence of the lost codicil at the time of the testator's death. It is apparently the view of respondent that since the testator named her as executrix in the lost codicil, he confirmed that choice when he turned over his money belt to her husband, Mr. Charles G. Young, for safekeeping. There is nothing in the record, however, to indicate that the testator was think-

ing in terms of the administration of his estate or that he turned his money belt over to Mr. Young, who was not only decedent's son-in-law but an attorney, rather than to any one else for any other reason than that he could trust Mr. Young with its safekeeping during his illness.

According to the testimony of Mrs. Della Bristol, the wife of one of the testator's sons, the appellant made the statement to her eight days before the death of the testator that "if she could get her fingers on the will and the deeds she would tear them all up except Walter's." There is nothing here to suggest that the will was in existence at the time of the testator's death. Nor would this evidence by itself support a finding that appellant destroyed the codicil, and there is no indication in the findings that she did so. There is no evidence that she ever saw the codicil or had any opportunity to destroy it. The bank records show that no one but the testator ever had access to the testator's safe-deposit box in which he kept his valuable papers, and in which the will, the first codicil, codicil number two, and the deeds were found after his death. Appellant's character, however it is evaluated, and her motives, however suspicious they may appear, cannot stand as proof of the fraudulent destruction of the will when there are no facts or circumstances that make such a destruction plausible. Her own testimony did nothing to establish such a destruction, and it is therefore immaterial whether or not the trial court believed her, for a fact is proved by affirmative evidence, not by disbelief of a witness. (*Moulton* v. *Moulton*, 178 Minn. 568 [227 N.W. 896]; *Hyslop* v. *Boston & Me. Ry.*, 208 Mass. 362 [94 N.E. 310; 21 Ann. Cas. 1121]; *Boice-Perrine Co.* v. *Kelley*, 243 Mass. 327 [137 N.E. 731]; see 23 C.J. 51; 32 C.J.S. 1134.)

A finding of fact cannot be sustained if no evidence appears in the record from which the trier of facts could reasonably infer that it is more probable that the fact exists than that it does not. The suggestion in the majority opinion that evidence may be overwhelming in its persuasiveness even though it "may appear relatively unsubstantial—if it can be reflected at all—in a phonographic record" is in effect a suggestion that an appellate court may disregard the manifest unpersuasiveness of the evidence it is charged to review. If an appellate court could attribute reality to the phantom of a persuasiveness that does not survive in the record, it

would no longer be bound by the record itself and could even affirm a judgment that was not sustained by any proof.

The relation between the presumption of revocation, invoked in the majority opinion, to Probate Code section 350 requires clarification. Section 350 of the Probate Code provides: "No will shall be proven as a lost or destroyed will unless proved to have been in existence at the time of the death of the testator, or shown to have been destroyed fraudlently or by public calamity in the lifetime of the testator, without his knowledge." Some confusion has attended the application of this section since the majority opinion in *Estate of Sweetman*, 185 Cal. 27 [195 P. 918], first invoked the presumption that a will has been revoked when it is known to have been in the possession of the decedent but cannot be found after his death. Apparently the presumption was regarded as arising independently of section 1339 of the Code of Civil Procedure, the antecedent of Probate Code section 350, for the will was admitted to probate not simply because the declarations of the testatrix showed that she had not revoked it and thus had the effect of overcoming the presumption (185 Cal. 27, 33), but also because under section 1963, subdivision 32 of the Code of Civil Procedure, a thing once shown to be in existence is presumed to continue in existence so long as things of that nature usually exist. (185 Cal. 27, 34.) It would not have been necessary to invoke the presumption of continued existence if in the opinion of the majority, the requirements of section 1339 had been satisfied by proof of nonrevocation. In a vigorous dissent, Justice Olney took the view that proof of nonrevocation was immaterial, since existence of the will at the time of the testator's death had to be established, and that the very purpose of section 1339 was "to make it impossible, to probate an unproduced will by proof that it was in existence prior to the testator's death eked out by any presumption that it continued to exist until he died."

Subsequently in *Estate of Ross*, 199 Cal. 641, 647, 648 [250 P. 676], the court overruled the holding in *Estate of Sweetman* that a will once in existence is presumed to continue in existence, declaring: "If the rule were otherwise all that would be necessary in order to prove a lost or destroyed will would be to show that the will was in the possession of the testatrix some time, any time, prior to her death with no apparent intervening cause for destruction

or revocation, and thus rebut the presumption of revocation and entirely nullify the requirements of said section 1339.'' Without the presumption of continued existence the order admitting the will to probate could not have been affirmed in the Sweetman case, for there was nothing else to prove the existence of the will at the time of the death of the testatrix. Nothing in that case, therefore, affords any support for the proposition that proof of nonrevocation alone is sufficient to comply with Probate Code section 350.

While the overruling of *Estate of Sweetman* did much to dispel the confusion engendered by that case, the relation of Probate Code section 350 to the presumption of revocation that is said to arise in these cases still requires clarification. If section 350 provided simply that a presumption of revocation arises in the case of a lost will, it would be necessary only to rebut the presumption to prove that the will was in existence at the time of the testator's death. A presumption of revocation independent of section 350 becomes superfluous, however, if the very existence of the will at the time of the testator's death must be proved. While proof of that existence establishes the fact of nonrevocation, the converse does not follow that a will exists because there is no revocation thereof. It would therefore be idle to rebut the presumption of revocation if there were no proof that a will existed at the time of the testator's death.

Section 350 cannot reasonably be construed as creating a presumption of revocation. It is concerned, not with the rules governing revocation, which are specifically set forth in section 74 of the Probate Code, but with the procedure for establishing a lost or destroyed will. (*Estate of Patterson*, 155 Cal. 626, 633-638 [102 P. 941, 132 Am.St.Rep. 116, 18 Ann. Cas. 625, 26 L.R.A.N.S. 654].) Compliance with the substantive provisions that determine the status of the will as an executed instrument is not enough to render the will operative as a conveyance. A will cannot be given in evidence as the foundation of a right or title unless it has been duly probated (*Estate of Patterson*, 155 Cal. 626, 636 [102 P. 941, 132 Am.St.Rep. 116, 18 Ann.Cas. 625, 26 L.R.A.N.S. 654]), and section 350 prescribes the requirements that must be satisfied before a lost will can be probated. It is therefore not controlling that under the substantive provisions of the law, the will has been duly executed and has not been revoked, for it cannot be probated if the requirements pre-

scribed in the code for the probate of wills cannot be met. The requirement of proof that the will existed at the time of the testator's death cannot be translated into a requirement of proof of nonrevocation. Such a translation would render meaningless the provision regarding wills destroyed fraudulently or by public calamity, for under Probate Code section 74 there can be no revocation under such circumstances. Indeed, the amendment with respect to wills destroyed by public calamity was held applicable in *Estate of Patterson*, 155 Cal. 626 [102 P. 941, 132 Am.St.Rep. 116, 18 Ann.Cas. 625, 26 L.R.A.N.S. 654], to a will destroyed before the adoption of the amendment, on the ground that the will had not been revoked. Had the destruction amounted to a revocation of the will, the estate would have vested in the heirs and the subsequent amendment could not have served to take the estate from them. Since the probate procedure related simply to the remedy and not to the foundation of the rights of those claiming under the will, the amendment was held applicable. The will was admitted to probate, not simply because it was unrevoked, but because by virtue of the amendment a will destroyed by public calamity without the knowledge of the testator could be probated even though it was admittedly not in existence at the time of the death of the testator.

In section 350 of the Probate Code, the Legislature has exercised the greatest caution not to leave the way open for the establishment of spurious wills or the probate of wills that testators have intentionally destroyed without leaving adequate proof of such destruction, even going so far as to preclude probate of a will that is lost or destroyed, other than by fraud or public calamity, before the death of the testator. (*Estate of Johnson*, 134 Cal. 662 [66 P. 847]; *Estate of Patterson, supra; Estate of Kidder*, 57 Cal. 282.) It has placed upon the testator the responsibility for the safekeeping of his will until his death. At the same time it has recognized that once the testator dies there is greater risk of loss or destruction of his will, and it has therefore sought to insure that his wishes would nonetheless be carried out, by providing that his will need not be in existence at the time of probate so long as there is proof of its existence at the time of death and proof by two witnesses of its provisions. It is for the Legislature to choose or modify the course it deems proper in this regard, not for the court to undertake

modifications merely because in its view the Legislature has acted in excess of caution.

The judgment should be reversed.

Curtis, J., and Edmonds, J., concurred.

Appellant's petition for a rehearing was denied December 27, 1943. Curtis, J., Edmonds, J., and Traynor, J., voted for a rehearing.