[Civ. No. 4861.   Fourth Dist.   Aug. 17, 1954.]

ORVILLE SHERIDAN, Respondent, v. RANDALL S. EPPS, Appellant.

Lindley, Lazar & Scales and John H. Barrett for Appellant.

Bertram J. Brown for Respondent.

MUSSELL, J.—Defendant appeals from a judgment in favor of plaintiff in an action for damages for personal injuries arising out of an automobile accident.  The case was tried by the court without a jury and it is the contention of appellant that the findings are not supported by the evidence; that they are in direct contradiction thereof; and that the conclusions of law are likewise unsupported.

The accident occurred between 7 and 8 a. m. on May 30, 1952, on Pacific Highway (U. S. 101) in the city of San Diego, approximately a quarter of a mile south of the Balboa

Avenue intersection, north of Mission Beach. The highway extends generally north and south in this area. There are two northbound and two southbound traffic lanes separated by a small "island," and there is a road shoulder adjoining the outside southbound lane sufficient in width to park a car completely off the highway. Defendant was driving south in the outside or westerly lane at a speed of approximately 35 to 40 miles per hour. In the immediate vicinity of the point of collision a car was parked, headed south on the west shoulder of the highway, and a young man was standing near it attempting to stop a passing car for assistance. Defendant, seeing the parked car and the man standing at the rear of it with his hand raised, in an attempt to stop approaching cars, stopped to lend aid.

In his deposition Epps stated that he traveled 20 yards beyond the parked car before coming to a stop; that he looked in the mirror and saw a Nash automobile southbound in the inside lane but saw no other cars; that he angled over and pulled up in front of the parked car; that he did not know whether the back end of his car was out in the lane of traffic or not; that he pulled his car to a stop, looked out, called to the man at the parked car, and was intending to back up, but before he had an opportunity to do so, plaintiff's car collided with the rear end of his, Epps', automobile. However, Kenneth Perrin, a traffic officer who arrived at the scene immediately after the collision, testified as follows:

"A. I asked Mr. Epps how the accident had happened and he said he was driving south on the highway and in the lane "S-1" and he saw this car parked on the shoulder of the road there, apparently in trouble, very evidently in trouble, so, he thought he would stop and assist the man, but in so stopping, he stopped too far beyond the car that was disabled, and he said that he stopped, he put his car in reverse and started backing up, and then this other car ran into him."

He further testified that he issued a citation to Epps for illegally backing a car on the highway; that he fixed the point of impact immediately to the east of the parked car; that there were approximately 30 feet of skid marks on the highway extending north from the point of collision and there were pieces of dirt, glass and debris on the highway at the point of collision.

Plaintiff was traveling south on the highway and had been driving behind the Epps car for approximately a quarter of a mile before the accident happened. He testified that he ob-

served Epps slowing down and at that time he estimated the distance between the two cars as being between 135 and 150 feet; and he observed the car parked on the shoulder; that Epps drove past it for an estimated distance of 30 feet, came to a complete stop in the center of the southbound lane of traffic and without turning or angling off the shoulder of the road, immediately started backing his car to the north; that Epps came to a sudden stop and immediately put his car "in reverse motion"; that the point of impact was east and "along side" the front door of the parked car, that upon realizing that Epps was slowing down, he, Sheridan, applied his brakes and "slid everything he had"; that at this time he observed a southbound car passing him on the left in the easterly southbound traffic lane; that he did not change the course of his car "because if I had went in either direction, if I would have went to my left the man coming up on the side would have gotten me, and if I had went to my right, I would have gotten the gentleman that was parked with his family in the car"; that Epps gave no signal indicating that he was going to stop and plaintiff saw no luminating stop· lights.

A witness, L. C. Raibourn, was driving north on the highway at the time of the accident. He saw the cars collide and stopped. He testified that he saw glass, dirt and mud on the highway between the parked car and Sheridan's car and that the cars collided beside the parked automobile.

▮ The trial court found, *inter alia*, that immediately prior to the accident the defendant was driving south on the highway at a speed of approximately 40 miles per hour and that at the same time plaintiff was driving south in the same traffic lane at approximately the same speed and at a distance of approximately 135 feet behind the defendant; that defendant drove past the parked car approximately 60 feet and while still on the paved portion of the highway, brought his car to a stop; that defendant then intentionally commenced backing his car in a northerly direction in the righthand southbound traffic lane; that while defendant's car was moving backward, plaintiff's car collided with it at a point approximately alongside the parked vehicle and in the righthand southbound traffic lane; that plaintiff attempted to avoid the collision by applying his brakes; that he was precluded from turning to the right (west) because of the parked automobile and precluded from turning to the left because of southbound traffic in the inside southbound traffic lane; that

plaintiff was not negligent and that his conduct was not the proximate cause of the collision; that defendant was negligent and as a direct consequence of the said collision, plaintiff's car was damaged and he suffered severe and permanent injuries and was compelled to undergo a major surgical operation. These findings are sufficiently supported by substantial evidence.

The testimony of defendant that he brought his car to a stop about 20 yards in front of the parked car and was struck by plaintiff's before he started to back his automobile merely created a conflict in the evidence and since there was substantial evidence supporting the trial court's contrary findings, they cannot here be disturbed. (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689].)

Appellant argues that the accident could not have happened as found by the court. This argument is without merit. The speed of the two cars prior to the accident, the distance they were apart, and the distance traveled beyond the parked car by the defendant were all estimates. The finding as to the point of impact, the reverse movement of defendant's car and his negligence were amply supported by the record.

Appellant further argues that the evidence is insufficient to sustain the finding that plaintiff was severely and permanently injured by the negligence of defendant. This argument is likewise without merit. The evidence shows that Sheridan's head struck the windshield and steering wheel of his car; that when the two cars came together the bucket seats of his car went forward and "split" and he was lying between them; that he had a laceration on the chin and head; that he felt numb and suffered pain in his neck and shoulders. He was taken to a hospital where he was given a superficial examination and released. A day or so after the collision one side of his body began to swell, he was barely able to get around, and although he reported for work several times following his injuries, he was never able to complete his shift and had to resign.

In 1951, while employed by a shipbuilding corporation in San Diego, plaintiff commenced having pains and discomfort in his neck. He consulted Dr. Woods, a competent neurosurgeon, who performed an operation which revealed that because of plaintiff's unusually long neck the spinal cord was being stretched and supported in an abnormal position in the spinal canal by the dentate ligaments. To relieve the stretching and pressure of the cord the ligaments in the cervical area were

severed and the spinal column allowed to fall free in the spinal canal. Plaintiff made an excellent recovery from this operation and returned to his job for about a month but stated that the work was a "little heavy" for him. He experienced stiffness and pain in his neck and shoulders and a second and relatively minor operation was performed by Dr. Woods on October 31, 1951. Following this operation plaintiff "did better" but had a rather slow convalescence. He obtained employment as a janitor and maintenance man. On April 21, 1952, plaintiff, upon coming to the surface after swimming under water in a Y.M.C.A. pool, struck his head against the under side of a low diving board. He was stunned by this blow but apparently no substantial damage or severe injury resulted therefrom. He worked that evening and continued to work regularly until May 30, 1952, the date of the accident.

On June 10 of that year plaintiff again saw Dr. Woods, who found that plaintiff's neck was stiff, in spasm and practically totally paralyzed as far as motion went. Plaintiff was then examined by Dr. Barta, who caused X-ray pictures to be taken which revealed a deformity in plaintiff's neck. Traction treatment to straighten the neck was applied which involved the drilling of several holes in plaintiff's skull and the insertion of tongs therein to which cords were attached. To the cords were fastened weights which passed over pulleys. This means of treatment proved unsuccessful and on August 12, 1952, Dr. Woods and another surgeon took a bone graft from plaintiff's pelvic bone and fused his neck, making it jointless and forever solid. Since this operation plaintiff has been unable to turn his head or raise it up or down except in a very limited manner.

Dr. Woods testified that in his opinion "the damage which was done either at the time of the snap injury to his neck (at the time of the accident) or when we were pulling his neck before operation or at the time of the operation the nerves going to his shoulder girdle and arm had been permanently damaged"; that there was something wrong with the position of plaintiff's spine before the accident; that it was held rigid and that the deformity had been due to some violence such as a snap injury.

There was substantial evidence to support the inference and finding of the trial court that the plaintiff received severe and permanent injuries as a result of the accident.

Judgment affirmed.

Barnard, P. J., concurred.