280 P.2d 419

M. W. CROUCH, as Guardian of the Estate of Wm. L. Geyer, Incompetent, Plaintiff-Respondent,

v.

Katie F. BISCHOFF, individually, and Katie F. Bischoff, as Administratrix of the Estate of William A. Bischoff, Deceased, Defendants-Appellants.

No. 8148.

Supreme Court of Idaho.

Feb. 28, 1955.

Herman E. Bedke, Burley, for appellants.

Nielson & Nielson, Burley, for respondent.

**ANDERSON, Justice.**

Respondent (plaintiff) brought this action to quiet title and for possession of an 80-acre tract of land in Cassia County, Idaho, and for damages.

Appellants (defendants) filed an answer and cross-complaint in which they allege that Wm. L. Geyer on January 19, 1949, offered to sell them the property and that they accepted the offer and purchased the property under contract, which they fully performed; and they ask the Court to order specific performance on the part of respondent by the execution and delivery to them of a good and sufficient deed.

The evidence discloses that Wm. L. Geyer and his wife acquired the property by patent in 1917 and verbally leased it in 1937 to William A. and Katie F. Bischoff on a year-ly crop rental basis. This arrangement continued until 1948, when a written lease was made and the Geyers moved to Portland, Oregon. Thereafter, respondent M. W. Crouch acted as Mr. Geyer's agent in connection with the farm.

January 19, 1949, Mr. Geyer wrote to the Bischoffs and stated he would like to sell the farm either that spring or the next and wanted to be as good as his word and give them the first chance. He stated he had been offered $20,000 by three different parties, but that he would take $1,000 less if they purchased it.

February 25, 1949, Mrs. Bischoff wrote to Mr. Geyer and among other things, stated:

"We was thinking that we would still have a chance on the place, but it won't be now. * * * We would like to see you get $20,000 out of it if you could."

March 11, 1949, she wrote another letter to him in which she stated they couldn't buy then, and she added:

"I have had a feeling we would never get to buy this place and I did tell you that Bill would never get much out of his share of his mother's estate which happens to be that he came out on the little end."

November 1950, Mrs. Geyer died and Mr. Geyer became the sole owner through establishment of record title by proceedings in the Probate Court of Cassia County.

May 23, 1951, Mr. Bischoff made application to a bank in Burley for a loan and listed as his assets: cash in the sum of $55, cattle, crops, farm machinery and a 1950 Chevrolet, the total being $6,492.50. He made another application the following year on February 11, in which his assets were similar, the total being $6,506.

February 5, 1951, Mr. Geyer wrote the Bischoffs enclosing a certificate of membership in the Unity Light and Power Company, stating he had not sent it sooner, because—

"I think you will understand for I think (you) know for a while it was hard for me to keep track of valuable papers and so forth and I remember this certificate was missing for a while. But I thought we had found it and sent it to you. This morning I found it under one of cushions of the davenport."

It is to be noted this Exhibit, being Ex. No. 5, was introduced in evidence by appellants.

Several other letters passed between the parties before Mr. Bischoff's death, but none of them are of much assistance on the question involved in this case. One of the letters, dated December 10, 1951, written by Mr. Geyer to the Bischoffs, inquired whether he had seen Mack Crouch "and got fixed up on the deed." Apparently this referred to a conversation they had about the sale of the property when Mr. Bischoff was in Portland in the fall of 1951. He also went to Portland to see Mr. Geyer in the fall of 1952, which is hereinafter discussed.

January 18, 1953, William A. Bischoff died and February 28, 1953, Katie F. Bischoff was appointed administratrix of his estate. Immediately after her husband's death, Mrs. Bischoff refused to allow respondent Crouch, as agent for Mr. Geyer, to have anything further to do with the operation of the farm, contending she owned it. She testified they had corresponded with Mr. Geyer and talked with him over the telephone some time between January 19 and March 10, 1949, any they had reached an agreement and a contract and deed were sent to respondent Crouch; that they were to pay $6,000 down and 4½% interest, the contract to run for twenty years.

After the death of William A. Bischoff, Mrs. Bischoff telephoned Mr. Geyer, January 21, 1953, and asked him to write a letter showing they had bought the place. January 24, 1953, Mr. Geyer wrote a letter, the contents of which are:

"I am writting this in regards your request in our telephone conversation last evening. I could not get it off at that time as I wanted to contact my Agents to verify anything I should say and their report is just as I told you the agreement was the price was $18000.-00 and when Bill was here last time he verified that before me and my agent also a Baptist minister who happened to be presint at the time after Bill

was gone I told my agent if you was ready to pay the balance at this time I would knock off $1000.00 so that is what happened. The $12000.00 you deposited in Bank was released and Mack Crouch paid in $5000.00 plus interest on this amount. Now Kate you know as well as I that this sale was made between you and my agent whom I had given A*r*thority and it was done that way on account of my wife's health and I feel the deal has been carried out as agreement.

"Now I am satisfied and when Bill was here he told me personally and before the ones I have mentioned that he was satisfied, and I trust you are and that gives you the information you wanted."

March 3, 1953, respondent was appointed guardian of the estate of Wm. L. Geyer by the Probate Court of Cassia County, Idaho. The evidence discloses that Mr. Geyer was a few months past eighty-two years of age at the time of the trial, September 1953.

Mrs. Bischoff contended her husband had paid $12,000 in cash to Mr. Geyer when in Portland in the fall of 1952, which was to be payment in full, as she contended $5,000 had been paid from crop money and the price reduced $1,000 because of the balance being paid in cash. She admitted her husband never received a receipt for the $12,000, and she did not name any bank in which the money was ever deposited, as stated in Geyer's letter. She stated her husband had inherited $3,800 about 1949 from an estate and that he had a bank box with some money in it, the exact amount unknown. When the box was opened after his death, there was no money in it.

Ralph Geyer, a son of Wm. L. and Grace L. Geyer, testified he was unable to locate the $12,000 or any part thereof.

Respondent Crouch testified he kept the books and records for Mr. Geyer pertaining to transactions with the Bischoffs for the years 1949 to 1952, both inclusive; that the total receipts were $6,724.02 and taxes and other expenses were $2,759.13, leaving a balance of $3,964.89. He also testified that in 1948 he did not make any collections for rent or crops other than a small payment for hay. Respondent paid, either directly or by allowing credit for anything Mr. Bischoff paid, a fee for potato support, all irrigation charges and taxes on the land, and fire insurance on the buildings; purchased grass and alfalfa seed and bought a headgate, faucet and pipe, and paid a bill for pump service and made practically all repairs and upkeep he knew anything about and had no knowledge of any improvements being made by the Bischoffs during the years above mentioned. None of this evidence was contradicted. Respondent also testified he never received a contract or deed from Mr. Geyer, nor any interest payments on any contract between the Geyers and the Bischoffs; that he knew Mr. Geyer had offered to sell the property

to the Bischoffs and that Mr. Bischoff had talked with him, even after his last trip to see Mr. Geyer in the fall of 1952, and wanted to borrow five or six thousand dollars through Mr. Crouch for a down payment on the farm. The loan was refused, as his Company would not make a loan for a down payment of this kind. Respondent stated his relationship with the Bischoffs had been friendly until the latter part of 1952, when there was a little difficulty over "getting Mr. Bischoff up on his back account."

The evidence discloses that Mr. Bischoff made small loans from a local bank in 1952 and part of the money was not paid at the time of his death; that he had given a few checks to a cigar store and had asked they be held until he could pay them. Two bankers from different banks testified Mr. Bischoff had approached them for a loan in 1952, seeking to borrow money for a down payment on the Geyer property and each declined to make the loan.

A letter, Ex. F, dated March 23, but does not show in what year, disclosed that Mr. Geyer's wife had refused to sign any papers to sell the property to the Bischoffs, but at the time the letter was written, she had changed her mind. There is, however, no evidence whatever showing she did sign a deed or contract pertaining to the farm.

Dr. F. G. Salstrom of Portland, Oregon, testified he was Chairman of the Finance Committee for the Oregon Baptist Retirement Home, where Mr. Geyer was living and that in the fall of 1952, when Mr. Bischoff was there, he told him he did not have sufficient money to buy the Geyer property, but he desired the rent he had paid in past years to be applied on the purchase price. The Doctor stated he was surprised at being consulted, but Mr. Geyer seemed to be of the opinion he knew all about the ranch affairs. Dr. Salstrom further testified that after Mr. Bischoff's death, Mrs. Bischoff and her daughter, Mrs. Berry, came to Portland in February 1953, called him out of Church and asked him to take a blank deed, have Mr. Geyer sign it, and they would have it properly filled in the next day. This he refused to do.

The trial court found there was no contract or sale of the land, nor had any payments been made on a purported sale and the court entered a decree in favor of respondent quieting title, ordering delivery of immediate possession of the property to respondent, together with improvements and appurtenances thereto, and recovery of certain portions of the crops. The court denied all relief asked for by appellants.

Appellants assign error on the ground the findings of the court do not conform to the weight of the evidence and in refusing to grant appellants a decree of specific performance and that the court erred, after refusing to grant specific performance, in not retaining jurisdiction and awarding appellant damages for the repayment of the purchase money paid, together with

the value of improvements they had placed on the premises in reliance upon a contract.

Respondent contends there never was any more than an offer to sell, which was not accepted, and therefore, there never was a contract. Respondent further contends if there were an oral agreement, it was void as in violation of the statute of frauds, Sections 9–503 and 9–505, Idaho Code.

Appellants contend the statute of frauds cannot be raised on appeal by respondent, because it was not plead and even if it could be raised, appellants have complied with the statute sufficiently as to the requirement that it be in writing, and further by their having fully performed the contract, they come within the terms of Section 9–504, I.C., which provides for exceptions.

The first question to be decided is whether appellants have proved there was a contract for the sale of the farm, as they contend.

"The law requires as a condition to specific performance that the contract be proved by clear and convincing evidence. * * *

"Further, the contract must be 'complete, definite and certain in all its material terms, or contains provisions which are capable in themselves of being reduced to certainty. * * *' Locklear v. Tucker, 69 Idaho 84, 203 P.2d 380, 384; 49 L.R.A.,N.S., 116,

note; * * *." Anderson v. Whipple, 71 Idaho 112, at page 123(13, 14), 227 P.2d 351, at page 358.

A greater degree of certainty is required to sustain a decree for specific performance than is required to sustain a judgment for damages at law, Anderson v. Whipple, supra, and an agreement which leaves any of the material terms or conditions for future determination cannot be enforced. If we take the testimony of appellants, themselves, at its face value and without diminution in weight by the contrary evidence of respondent and his witnesses, the element of certainty and the degree of proof necessary are not found.

In our opinion the evidence in this case not only fails to support a complete, definite and certain contract, but on the contrary, raises a great doubt as to whether any contract ever was made for the sale and purchase of the land in question. The trial court found there never was a contract entered into for the sale of the farm, either in writing or verbally, and nothing ever was paid on the purchase price.

Even if there were substantial, though conflicting, evidence on each side, nevertheless, appellants could not now prevail because in such a case the trial court who heard the witnesses, saw and observed their demeanor on the witness stand, was in a better position than this Court to reach a proper decision on the facts, and his findings and decree will not be disturbed on

appeal. Crenshaw v. Crenshaw, 68 Idaho 470, 199 P.2d 264; Anselmo v. Beardmore, 70 Idaho 392, 219 P.2d 946; Smith v. Cooper, 73 Idaho 99, 245 P.2d 816; Moss v. Vest, 74 Idaho 328, 262 P.2d 116; Independent School Dist. v. C. B. Lauch Const. Co., 74 Idaho 502, 264 P.2d 687; State ex rel. Modern Motor Court v. H & K Construction Company, 75 Idaho 492, 274 P.2d 1002.

"In discussing the rule it is said in Estate of Bristol, 23 Cal.2d 221, at page 223, 143 P.2d 689, at page 690: '* * * The critical word in the definition is "substantial"; it is a door which can lead as readily to abuse as to practical or enlightened justice. It is common knowledge among judges and lawyers that many cases are determined to the entire satisfaction of trial judges or juries, on their factual issues, by evidence which is overwhelming in its persuasiveness but which may appear relatively unsubstantial—if it can be reflected at all—in a phonographic record. Appellate courts, therefore, if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover, whether such doubt or conflict exists, the court should be realistic and practical.'" Risley v. Lenwell, Cal. App., 277 P.2d 897, 909.

We are of the opinion the trial court was correct in his findings of fact, conclusions of law and decree. In view of the finding of the trial court and our holding that there never was a contract, it is unnecessary for us to consider the remaining assignments of error, specified by appellants.

Judgment is, therefore, affirmed. Costs awarded to respondent.

TAYLOR, C. J., and KEETON, PORTER, and SMITH, JJ., concur.