[Civ. No. 54402. Second Dist., Div. Three. Mar. 28, 1979.]

Estate of JENNIE VESSELS OBERNOLTE, Deceased.
DONA WILSON, Petitioner and Appellant, v.
EUGENIA CASKEY, Claimant and Respondent.

**COUNSEL**

Gibson, Dunn & Crutcher and John A. Ruskey for Petitioner and Appellant.

Sull Lawrence for Claimant and Respondent.

**OPINION**

**COBEY, Acting P. J.**—Dona Wilson appeals from an order denying her petition for revocation of the probate of a will of Jennie Vessels Obernolte, deceased, executed some two months before her death on December 21, 1974. The appeal lies. (Prob. Code, § 1240.)

 The fundamental issue on this appeal is whether there was before the trial court substantial evidence to support its key finding of fact "[t]hat [it] is equally probable that if decedent's copy of Will was destroyed, it was destroyed by someone other than the decedent." We conclude that there was and we will therefore affirm.

FACTS

On October 17, 1974, the decedent, being of sound mind, duly executed in the office of her attorney, Mr. Forde, an original and a duplicate original of a will under which she left her estate, share and share alike, to her only child, the just-mentioned petitioner, Dona Wilson, Mrs. Wilson's two children, and the decedent's sister and two brothers. She apparently took the original of the will home to her apartment and placed it in a cedar chest in her bedroom. She kept this chest locked and she and her sister had the only two keys to it.

The only person living with the decedent, off and on, was her handyman, Mr. Vance Mayers, who helped her in her personal wants and maintained the apartment complex which she owned and managed. She

was a lonely and fearful woman, whose contact with the just-mentioned members of her family was almost entirely by telephone.[1] She was apparently unhappy with practically all of the members of her family, including Mrs. Wilson. She complained that they never visited her and she was frequently depressed. Consequently she told at least two people in November of 1974 that she was tearing up her will, so "that she wasn't leaving anyone a 'd' thing, [and that] if they got anything, they would have to fight for it."[2]

On the other hand, during the approximately two months that intervened between the making of her last will and her death, she expressed concern about the security in her apartment of the original of the will and suggested that she might move it from the locked cedar chest to a cupboard in her kitchen. Furthermore, although she visited her attorney's office, which was only a block and a half from her apartment, eleven days before her death to try to consult with him about a business matter, and although she chatted with his secretary at length at least seven times about how lonely and unhappy she was and her fears for her safety, she never mentioned to either of these people anything about destroying her will or having it redone.[3]

Within hours of her death on December 21st, one of her tenants informed her daughter of her demise. Mrs. Wilson came over immediately and, according to her testimony, searched the apartment unsuccessfully for the original of the will for a couple of days. According to her, she found the empty envelope from the cedar chest in which the will had apparently been kept, but she could never locate the original instrument itself. Her further extensive search for a possible safe deposit box was also unsuccessful.

The day after the decedent's funeral, Mr. Forde informed Mrs. Wilson by telephone that he had at his office the duplicate original of the will and

---

[1] With the exception of one of her brothers, none of her family had seen her for at least a year before she died. He brought her to his home in Anaheim on her last Thanksgiving. She indicated to him at that time that a handyman had beaten her up. This was the individual with whom she customarily drank socially.

[2] She also told both her daughter and her granddaughter that she was not going to leave a will.

There is nothing in the record indicating that the decedent knew that if she died intestate her daughter would inherit her entire estate.

[3] The last of these chats occurred three days before she died.

Attorney Forde had drawn two earlier wills for the decedent.

generally of its provisions.[4] A few days later Mrs. Wilson came to the office and according to Mr. Forde "she was most unhappy and distressed" when she actually saw the duplicate original of the instrument.

The trial court found, among other things, that persons other than the decedent had access to the original copy of the will at her place of residence prior to her death and that, as already noted, it is "equally probable" that if the decedent's copy of the will was destroyed, it was destroyed by someone other than the decedent.

## DISCUSSION

I. *The Rebuttable Presumption of Revocation Came Into Play in This Case*

■■■ Such a presumption arises when it is shown that (1) the decedent had the will in her possession prior to her death; (2) she was competent until that time;[5] (3) the will could not be found after her death. (*Estate of Ross* (1926) 199 Cal. 641, 646, 648 [250 P. 676]; *Sparks* v. *Lauritzen* (1967) 248 Cal.App.2d 269, 274-275 [56 Cal.Rptr. 370].)

II. *This Presumption Is a Rebuttable Presumption Affecting the Burden of Producing Evidence Rather Than the Burden of Proof*

Evidence Code section 600 defines a presumption as "an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action." It also states: "A presumption is not evidence." According to Evidence Code section 601, a rebuttable presumption is either one affecting the burden of producing evidence or one affecting the burden of proof. Under Evidence Code section 603, the first-mentioned kind of presumption is established to implement no public policy other than the facilitation of the determination of the particular action in which it is applied. Evidence Code section 604 provides that the effect of this kind of presumption is to require the

---

[4]Mrs. Wilson's testimony as to when she first learned of the provisions of her mother's last will is quite confused. At the earlier proceeding to probate the duplicate original of the will she testified that her mother had never mentioned the existence of this will to her. At the hearing on her petition to revoke the probate of this will, however, she twice testified that she learned of the existence of this will from her mother the day after her mother made it. She also testified that she learned of the will's contents at that time. But she had earlier testified in this same proceeding that attorney Forde told her the contents of the will in his telephone call to her.

[5]There is no dispute about her competency until her death. She died at 69.

trier of fact to assume the existence of the presumed fact until evidence is introduced which would support a finding of its nonexistence. On the other hand, according to Evidence Code section 606, the effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proving the nonexistence of the presumed fact.[6]

Our Evidence Code does not expressly categorize the rebuttable presumption of revocation of a will. ██ But the Law Revision Commission, the draftsman of the Evidence Code, made clear in some of its comments to the code (see Deering's Ann. Evid. Code, §§ 630, 660 (1966 ed.) pp. 290, 317; 29B West's Ann. Evid. Code (1966 ed.) pp. 674, 705) that its list of rebuttable presumptions is incomplete and that, with respect to those not expressly mentioned in the code, their classification is left to the courts.[7]

It is our view that judicial classification of this presumption of revocation of a will impliedly occurred in the majority opinion in the just-mentioned case of *Estate of Bristol, supra,* 23 Cal.2d at pages 224-225. There the court said that this presumption could be rebutted by evidence showing that "it is *equally probable* (1) that the will was destroyed by another person than the decedent, or (2) that the act was not done with an intention to revoke the instrument." (Italics in original.) Equal probability does not satisfy a burden of proof; it does, however, satisfy a burden of producing evidence. (See Evid. Code, §§ 115, 550, subd. (a).) **(2b)** In other words, the effect of the rebuttable presumption of revocation of a will is prima facie only; it exists only until rebutted by substantial evidence. (See *Betts* v. *Jackson* (N.Y. 1830) 6 Wend. 173, 182-183.)

---

[6]Evidence Code section 605 provides that a presumption affecting the burden of proof is one established to implement some public policy other than the facilitation of the determination of the particular action in which the presumption is applied. Among the examples of such policies that the section gives is "the security of those who entrust themselves or their property to the administration of others." Petitioner, Mrs. Wilson, contends that this policy is the one underlying the rebuttable presumption of revocation. We do not agree. The consequence of giving effect to the presumption of revocation is that the decedent is presumed to have died intestate. The security of the decedent's estate is not affected by this consequence. What is determined by it is merely whether the estate will be administered pursuant to a will or pursuant to statutory law.

[7]The rebuttable presumption of revocation of a will is not a statutory presumption, but is instead a common law or judicially originated presumption. (See *Estate of Bristol* (1943) 23 Cal.2d 221, 234-237 [143 P.2d 689] (dis. opn. of Traynor, J.); *In the Matter of the Estate of Hartman* (1977) 172 Mont. 225 [563 P.2d 569, 571-573]; Witkin, Cal. Evidence (2d ed. 1966) § 259, p. 221.) It is in reality a double presumption. Destruction of the will is presumed from its disappearance and revocation is presumed from its destruction. (See *Colvin* v. *Fraser* (1829) 162 Eng.Rep. 856.)

■■■ III. *There Is Substantial Evidence in Support of the Challenged Key Finding of Equal Probability*

In the approximately two months that intervened between the preparation of the decedent's last will and her death, she talked quite a bit about destroying the will. But talking about her will, particularly to its beneficiaries, appears to have been a habit of hers. We entertain no doubt that she was quite unhappy with practically all of the will's beneficiaries and apparently was unaware of what would happen to her property if she died without a will. But, on the other hand, she did express definite concern about the security of her will and, although she visited the office of her attorney, who had drawn three wills for her, eleven days before her death and chatted at length several times with his secretary, who seems to have been something of a confidante for this lonely woman, she never mentioned to either of these people anything about destroying or redoing her will.

We regard this last-mentioned evidence as substantial evidence rebutting the presumption of revocation and supporting the key finding of equal probability. This finding is a carefully drawn finding. It is conditional in form because an equal probability did exist that if the decedent's will was destroyed, this act was done by someone other than the decedent; namely, either Mr. Vance Mayers, the handyman who was not a beneficiary under the will and who could possibly have had access to it before her death, or the petitioner, who stood to inherit all of her mother's estate without a will (see Prob. Code, § 222) but only one-sixth under the will.[8]

---

[8] At oral argument counsel for petitioner, without giving any explanation for his tardiness, moved that we augment the record on appeal pursuant to rule 12(a) of the California Rules of Court by adding thereto a deposition of one Robert Hawkins.

We hereby deny this motion as untimely. (See *People* v. *Preslie* (1977) 70 Cal.App.3d 486, 491-492 [138 Cal.Rptr. 828]; *Russi* v. *Preslie* (1977) 70 Cal.App.3d 486, 491-492 [138 Cal.Rptr. 828]; *Russi* v. *Bank of America* (1945) 69 Cal.App.2d 100, 102 [158 P.2d 252].)

A declaration of this individual was before the trial court when that court denied the petitioner's motion for a new trial. In that declaration Hawkins said that the decedent told him about a week or 10 days before Christmas 1974 that she had destroyed her will, but according to him, she made this statement in the context of an unsuccessful request to him that he take her to her attorney and a bank. We think it likely that the trial court disbelieved this declaration in view of the unrebutted testimony that about this time in December 1974 the decedent visited her attorney's office and chatted with her confidante, his secretary, and never brought up the subject of her will either to her attorney or to his secretary over the telephone or otherwise.

## DISPOSITION

The order of denial of revocation of the probate of the decedent's last will is affirmed.

Allport, J., and Potter, J., concurred.

A petition for a rehearing was denied April 26, 1979.