489

[Civ. No. 6123. Fourth Dist. Oct. 16, 1959.]

ARTHUR GERBER et al., Respondents, v. NAT SPECTOR, Defendant and Appellant; A. K. WYLIE, as Trustee in Bankruptcy etc., Cross-complainant and Appellant.

Roberts, Campbell & Ewing and D. M. Campbell for Defendants and Appellants.

Ernest R. Utley for Cross-complainant and Appellant.

Horton, Knox & Carter and R. L. Knox, Jr., for Respondents.

GRIFFIN, P. J.—Plaintiffs, cross-defendants and respondents Arthur Gerber and Allan Gerber, individually and as individuals doing business as Arthur Gerber and Company (hereinafter referred to as Gerber) brought this action against defendant, cross-complainant, cross-defendant and appellant Nat Spector (hereinafter referred to as Spector) et al., for $9,713.25, for goods, wares and merchandise sold and delivered to them. Spector answered, denied generally these allegations, and alleged that plaintiff, on behalf of Marty Sherman Company, cross-defendant and respondent, took possession of and marketed certain fields of cantaloupes, the property of said Sherman Company, and delivered said Spector cantaloupes belonging to said company valued at $9,713.50; that said Sherman Company was indebted to Spector in the sum of $19,500 on account of money loaned by Spector to Sherman Company; that as security for the money so loaned, Sherman Company gave Spector a $13,500 crop mortgage on certain crops then being raised by Sherman Company; that the cantaloupes sold by plaintiff were cantaloupes covered by the crop mortgage and the purchase price thereof should be applied on the obligation of Sherman Company. By way of amended cross-complaint against defendants and respondents Marty Sherman individually, Marty Sherman Company and Gerber, Spector seeks judgment for $13,500 damages, the claimed value of cantaloupes and watermelons plaintiff converted to his own use.

William A. Wylie, as trustee in bankruptcy for Marty Sherman Company (hereinafter referred to as trustee) filed a cross-complaint alleging that Sherman Company (hereinafter referred to as the bankrupt) was adjudicated a bankrupt on July 19, 1951; that it made an assignment to Spector of its interest in a certain crop of tomatoes for the purpose of securing a preexisting indebtedness to Spector for $19,000; that such assignment was made within four months of the filing of the bankruptcy proceedings by the bankrupt and the effect of such assignment was to prefer Spector over other creditors and was void; that Gerber attached funds from the sale of a tomato crop; and that such attachment was void. It is then alleged that Gerber, within said four months' period, took possession of all crops covered by his crop mortgages and proceeded to harvest and sell them and apply the proceeds first in payment of his $20,000 crop mortgage and then upon his own preexisting indebtedness; that while in possession of

said crops he abandoned and left unharvested about 15 truck loads of melons which could have been picked, and accordingly the bankrupt estate suffered damages in the sum of $50,000. An accounting is sought. One Babo Kahn filed a petition in intervention claiming that plaintiff attached $6,137.42 in the hands of West Coast Packing Company, claiming that it was his money in an account with Sherman Company and had been assigned to Spector. By stipulation of respective counsel this sum was deposited in court and said complaint in intervention was dismissed.

The trial court found generally in favor of Gerber on the issues presented and specifically found as true (1) that on or about February 14, 1951, bankrupt entered into a written contract with Gerber, wherein Gerber agreed to finance the growing of said melons, as particularly provided in said contract, and in return was entitled to take possession of said melons when packed ready for shipment and sell the same for the account of bankrupt, and receive the proceeds from sale in order to reimburse Gerber for moneys paid, earned and advanced pursuant to said contract; (2) that on or about February 15, 1951, and June 7, 1951, bankrupt executed and delivered to Gerber certain chattel mortgages covering the crops of melons specified in the contract above referred to and thereafter, other written agreements between bankrupt and Gerber, supplemental and amendatory of the original agreement, were made; (3) that all of said agreements and the said chattel mortgages were between the same parties and covered the same subject matter and therefore must be construed together in determining the agreement and relationship between bankrupt and Gerber; (4) that in this regard the court disregards the agreement of July 3, 1951, and gives plaintiffs no additional rights pursuant to it; (5) that by virtue of all of said writings Gerber was given a security interest in said melons, to secure repayment of the loans, advances and selling charges made and earned pursuant to said agreements, and Gerber had the right to and did take possession of said melons as the same were ready for shipment; (6) that between June 28th and July 1, 1951, Gerber sold and delivered to Spector a quantity of said melons and that the price therefor was mutually agreed to be $9,708.80, and accordingly Spector then became and was indebted to Gerber in said sum; (7) that defendant Spector had actual knowledge of the agreements and crop mortgages between bankrupt and

Gerber; that about May 11th bankrupt executed in favor of Spector a crop mortgage covering generally the same crops of melons as were covered by the mortgages given Gerber; however, said crop mortgage was not delivered to Spector, and recorded, until on or about June 12, 1951; (8) that said crop mortgage to Spector was subject in all respects to the crop mortgages and agreements between bankrupt and Gerber; (9) that the moneys loaned and advanced by Gerber to bankrupt were made for the purpose of financing the said bankrupt during the regular production period of said melons, and said moneys were necessarily advanced or expended by Gerber for the maintenance and preservation of the crops covered by said mortgages and agreements; (10) that Gerber has accounted for the proceeds of the melons sold by him for the account of bankrupt, and after allowing all credits and allowing for some minor discrepancies that Gerber lacked more than twenty thousand dollars of being repaid in full the moneys to which Gerber was entitled pursuant to the agreements with bankrupt; (11) that Gerber performed all of the terms of said agreements to be performed on its part; and that they made all advances they agreed to make and that Gerber was not in default thereunder. It then found (12) as not true that Spector was at any time entitled to possession of bankrupt's melons. It further found (13) that there was an undue delay in recording the Spector crop mortgage, and therefore said crop mortgage was void; (14) that even if said mortgage was not void, since Gerber had not been fully repaid, Spector, nevertheless, had no right to possess any of bankrupt's melons, since Spector had actual knowledge of the agreements and mortgages existing between bankrupt and Gerber; that bankrupt is indebted to Spector in the amount of $13,500; (15) that it is true that about May 11, 1951, bankrupt assigned to Spector an interest in a certain crop of tomatoes, being made for the purpose of further security for the preexisting indebtedness of $13,500; that said assignment was not delivered or effective until on or about June 12, 1951, and accordingly is void for lack of recordation prior to that date; that said assignment is in reality for purposes of security only, and the remaining proceeds from said tomato crop now on deposit with the clerk of the court, after paying to Babo Kahn his share, is $2,997.05; that Gerber acquired no interest in said moneys by reason of the attachment levied thereon; that said tomatoes were the property of bankrupt

and Babo Kahn as copartners; (16) that it is not true that Gerber took possession of all or any part of said melons at any time prior to the time said melons were packed, loaded and ready for shipment; that the harvesting, packing and loading of said melons was done by bankrupt in accordance with the agreement and said melons were, pursuant to said agreement, delivered to Gerber when ready for shipment and sale; that it is not true that Gerber was obligated to make further advances or loans to bankrupt on or about July 5, 1951, nor that Gerber permitted marketable melons to be abandoned, spoiled, or otherwise damaged; that Gerber had no obligation to make further advances or loans as there were no melons loaded and ready for shipment at the time Gerber left the premises of bankrupt and refused to make further advances; that it is not true Gerber knew or had reasonable cause to believe bankrupt was insolvent until on or about June 29, 1951; that it is not true Gerbers were enabled to obtain a greater percentage of their debts than other creditors in the same classification; that plaintiffs have made a full and true accounting for the proceeds of all melons received by them and after allowing all credits to which the bankrupt is entitled, the court found that said bankrupt is indebted to plaintiffs in an amount exceeding $20,000, against which must be credited any recovery by plaintiffs from Spector. Except as otherwise specifically found, it was generally found that the allegations contained in the cross-complaint of the trustee in bankruptcy were not true.

It then concluded that plaintiffs were entitled to judgment against Spector in the sum of $9,708.80; that the trustee was entitled to judgment against all the other parties to the action in the sum of $2,997.05, to be satisfied from the moneys heretofore deposited, pursuant to stipulation, with the clerk of the court; that Spector is entitled to judgment against the estate of the bankrupt in the amount of $13,500, as an unsecured claim against said bankrupt estate; that Spector is entitled to nothing against Gerber, on the amended cross-complaint of Spector; that trustee is entitled to nothing as against any of the cross-defendants, on the trustee's cross-complaint, excepting only that said trustee is entitled to the sum of $2,997.05 deposited with the court; and that Spector is entitled to nothing on his cross-complaint as against Marty Sherman, individually. Judgment was entered accordingly.

Spector appeals from the judgment in general. The trustee

appeals from the portion of the judgment decreeing that it recover nothing as against plaintiffs.

Viewing the evidence most favorable to sustain the attacked findings the following facts are disclosed in the record:

At the time this action arose Gerber was engaged in the fresh fruit and vegetable business as a buyer and broker. Bankrupt (Marty Sherman Company) was a corporation owning land in Imperial Valley and growing vegetables and produce for sale. S. & J. Distributing Company (hereinafter referred to as S & J) was a corporation generally purchasing for the market produce from growers and distributing it in the Los Angeles area. Sherman was president and manager of bankrupt and S & J. Sherman's wife and sons owned all of bankrupt's stock. Spector was a produce buyer and broker, buying vegetables and produce from growers in the Imperial Valley.

In February, 1951, bankrupt was growing melons on approximately 800 acres in the Imperial Valley and needed money to bring the crop to harvest. Sherman approached Gerber and after some discussion, bankrupt and Gerber entered into an agreement on February 14, 1951, prepared by bankrupt's attorney, whereby Gerber agreed to advance bankrupt $20,000; $7,500 payable immediately and the balance as needed to complete the crops. As security for such advances bankrupt agreed to give Gerber crop mortgages on up to 800 acres of melons and a second mortgage on bankrupt's packing shed and equipment, and to supervise the harvesting and packing of the crop in a farmerlike manner. Gerber was to handle the sale of crops grown on the mortgaged acreage, paying an advance to bankrupt of $475 per carload, and was to receive $50 per car as a selling charge on the melons grown and remit weekly the balance of the proceeds to the bankrupt, after deducting the money loaned to bankrupt, the $475 per carload advance and the selling charge. At the conclusion of the harvest Gerber was to furnish a complete accounting to bankrupt. As amended on February 17, 1951, the agreement provided that Gerber was to handle the sales to the best of his ability and at his discretion, either on an f.o.b. basis, delivered basis, consigned basis, or deferred billing basis. On February 15, 1951, bankrupt mortgaged to Gerber crops planted and growing on 530 acres in Imperial Valley as security for the payment to Gerber of the $20,000 advanced in accordance with the terms of the written agree-

ment of February 14, 1951, between the parties. Bankrupt agreed to attend to and protect the crop until ready for harvesting, to pick and pack it in the customary manner, and to transfer it to Gerber as described in the agreement. If bankrupt defaulted on any promise contained in the mortgage, Gerber had the right to take possession of the crop and take such measures as he deemed proper to protect it and any money expended or charges incurred by Gerber in so doing, including such advances, were to be deemed a debt due from the bankrupt and secured by the crop mortgage. These three crop mortgages were recorded February 16, 1951. Gerber paid bankrupt $7,500 on February 14, made an additional payment of $6,000 on February 22, a payment of $2,500 on March 6, and another payment of $4,000 on March 16.

On March 6, Spector had given S & J a check for $6,500. On March 13, Spector and bankrupt signed an agreement providing that Spector would advance to S & J the total amount of $6,500 and to bankrupt the total amount of $13,500. Bankrupt agreed to give Spector a third trust deed on 40 acres of business property in El Centro then being farmed to "honey-dews." The agreement stated that Sherman had executed crop mortgages and might in the future execute further crop mortgages in favor of Gerber pursuant to their agreement of February 14, which agreement Spector had read and understood. When Gerber released said crop mortgages bankrupt agreed to execute and deliver to Spector crop mortgages covering the same acreage as security for the repayment of the advances therein agreed to be made by Spector. As further security for the advances, bankrupt agreed to assign to Spector its interest in the tomato crop being grown under an agreement with Babo Kahn. On March 13, Spector advanced bankrupt $8,500; on April 14, Spector advanced bankrupt an additional $5,000; and on April 16, he advanced bankrupt another $1,000. Thus, Spector advanced $14,500 to bankrupt and $6,500 to S & J. On April 17, Gerber advanced bankrupt an additional $3,500. The check from Gerber to bankrupt was marked "Additional Advance on 1951 Melon Deal." Gerber testified that he had not the slightest idea what the money was actually used for but it was supposed to be used to help the crop along.

Gerber left the El Centro area after February and returned a few days before the melon harvest started. On May 11, bankrupt executed a crop mortgage in favor of Spector, securing

the $13,500 advances already made by Spector pursuant to the agreement of March 13, 1951. On this same date bankrupt executed an assignment of a certain tomato crop to Spector. Spector's agreement, mortgage and tomato assignment were prepared by bankrupt's attorney, and the mortgage and tomato assignment were retained in the attorney's office at Spector's insistence until they were recorded on June 12, 1951, after which the documents were delivered to Spector.

On May 13 the melon harvest began. Thereafter, Gerber made additional cash advances to bankrupt and purchased supplies to be used in harvesting and preserving the melons mortgaged to Gerber. It appears from the evidence that without these additional outlays the harvest could not have continued and the mortgaged melons would have been lost. The $475 per carload advance from Gerber to bankrupt was also to be a payment to enable bankrupt to harvest and preserve the mortgaged melons. By an oral agreement with bankrupt Gerber advanced $1.50 per crate on less-than-carload shipments and this was approximately the cost of harvesting and packing. June 7, bankrupt executed and delivered a crop mortgage on additional melons being grown on 330 acres to Gerber and Gerber recorded the mortgage on the same day. This mortgage is similar in its terms to the mortgages of February 16, and provides that it is security for the payment to Gerber of $20,000 in accordance with the terms of the written agreement dated February 14, 1951, and any money expended or charges incurred by mortgagee in taking such measures as mortgagee deems proper and necessary for the care and protection, harvesting or marketing of the crops. Gerber then had crop mortgages on all of bankrupt's crops except the tomato crop being grown under an agreement with Babo Kahn. On June 14, Gerber paid bankrupt $4,000. This payment was an advance to purchase a tract of melons. It was stipulated that the $4,000 was spent to buy another field of melons and not to preserve the fields already mortgaged. Sherman testified that the money was used to buy a 50 per cent interest in an 80-acre piece near Holtville; that upon completion of the purchase, Gerber was entitled to a 50 per cent interest in the field; and that the melons in this field were later harvested. However, Gerber was of the opinion that the $4,000 was used to complete the harvest of the mortgaged melons.

The record reveals a series of transactions between Gerber

and Spector. First was the occasion upon which they discussed the nature of their arrangements with the bankrupt. Second was the series of transactions in which Spector purchased melons from Gerber and paid him for them. Third was the series of transactions in which Spector purchased melons and refused to pay for them. This latter series of transactions gave rise to the complaint in which Gerber sued Spector. The date on which Gerber and Spector discussed their arrangements with the bankrupt is difficult to fix, but apparently it was after June 15. It seems well established that during this conversation Spector told Gerber he had loaned Sherman or the bankrupt some money and he did not know how he would get it back. Gerber testified Spector may have said that the loan was unsecured and Spector was upset because things were not going too good and Marty Sherman assigned Spector his half of the tomato crop to pacify him. Spector testified he knew of Gerber's crop mortgages and that Gerber's crop mortgages were to have priority over Spector's. The evidence establishes that Spector purchased the first lot of melons from Gerber on June 24th to 26th, and paid for them. Subsequently, between June 28th and July 1st, 1951, additional lots of melons were sold to him by Gerber for $9,708.81, and Spector refused to pay for them.

On June 29th the workers in bankrupt's packing shed stopped work when it became known that bankrupt did not have sufficient funds to meet that day's payroll. Gerber then had a conversation with bankrupt's office manager, in which she told Gerber that Sherman was using the money advanced on these shipments for purposes other than paying the costs of the harvest. Gerber then cashed payroll checks given the workers to keep them on the job. If this payment had not been made the harvest would have stopped and the melons harvested during the succeeding week would have been lost. The trial court found that as of June 29th Gerber had notice of bankrupt's insolvency.

The next crisis in the harvest arose on the following Wednesday, July 3, when Spector told Gerber he would not pay for the melons purchased by him during the preceding four working days. Gerber testified Spector promised to pay him for these melons but suddenly left town, closed his bank accounts and thereafter failed to pay for the melons. Spector testified that at the time he gave Gerber the check for the first lot of melons bought from him Gerber said: "Well, this pays me out of the deal." Spector also said that Gerber was in the room

while he talked with Sherman on the telephone during which conversation Sherman told Spector to take the melons and apply their value to the money owed by bankrupt to Spector. Gerber may not have heard this conversation. Spector admitted that Gerber had later demanded payment for the melons and that Spector had refused to pay for them. Spector admitted Gerber had set the price on these melons. Gerber testified he had no knowledge of any arrangement between Sherman and Spector whereby the latter could take all the melons he needed to pay himself for the advances he had made, and this testimony is supported by testimony of Sherman. Gerber also denied he made the statement attributed to him when Spector gave him the check in payment for the earlier purchase of melons and testified he had never been in Spector's apartment and did not receive a check there, but had received a check at the office. On July 3, 1951, Gerber and bankrupt amended the agreement of February 14th and the bankrupt gave Gerber a chattel mortgage on his fixtures. The trial court gave Gerber no rights under this agreement and held both the amendment and mortgage voidable preferences.

July 5th was the last day upon which any of bankrupt's crop was harvested. The workers staged a sit-down strike because their payroll checks were not issued. Gerber and the office manager attempted to get in touch with Sherman to tell him of the situation. About noon they reached him and he stated he would send the money to Imperial Valley for the payroll. The workers sat around all day waiting, but the money was not sent. Gerber sold the cars which were partially loaded and waited until midnight, but was unable to reach Sherman again and heard nothing more from him. On the next day Gerber left Imperial Valley and went to his home in Phoenix. No one asked Gerber whether he would stand good for the payroll of that last week.

One witness, supervisor of melon picking for bankrupt, estimated that 2,000 to 2,200 crates of melons were picked and unshipped on the last day and that there were 3,000 crates of cantaloupes unpicked in the field. Trustee's cross-complaint against Gerber is based on the theory that Gerber became a mortgagee in the possession of the melons and began to harvest them and then abandoned the harvest, causing valuable melons to be spoiled in the fields. Gerber claims he did not enter into possession of the crop but merely advanced money to bankrupt and directly to suppliers to obtain materials and labor neces-

sary to protect his security interest in the crop and then after the crop was harvested and packed he took possession of it for sale.

Gerber testified that during the melon harvest he was present in the bankrupt's packing shed practically all the time, but his duties there consisted entirely of selling the melons that were being packed by the workers in the shed; that to successfully sell the melons he had to be constantly informed as to the number, type and quality of the melons being harvested; that he had nothing to do with running the shed or telling the workers what to do; that as the melons were sold Gerber made advances to bankrupt which were to be payments for the cost of harvesting, labor in the shed and loading the melons onto the car; that all advances made by Gerber to bankrupt were necessary for the preservation of the crop; and without the advances the harvest could not have continued.

Sherman testified that sometime in the middle of June, 1951, he went to Los Angeles to supervise the sales of S & J and stayed there more or less permanently from then on, and that Gerber took over control of the harvest of the melons in Imperial Valley and Sherman left him in charge of the whole operation and Gerber assumed all responsibility for the harvest. On cross-examination, however, Sherman admitted that he previously testified that the arrangement he had with Mr. Gerber was that he left a foreman in charge there who would do the picking and supervising of the packing sheds and he left the office manager in charge, and that he did not have any arrangements with Gerber to step in and assume any responsibility.

There is a great deal of discussion in the briefs about the commissions charged on various sales. Two issues are raised in this regard: (1) that Gerber charged too much for commissions on less than full carload lots; and (2) that Gerber charged a commission on shipments which were consigned to eastern produce brokers who also charged commissions for selling the consigned produce to buyers in the east. Seventy-nine full carloads were sold by Gerber and he charged a $50 per carload commission. On the sales of less than a full carload he charged 20 cents per crate. The trustee contends he should have charged slightly in excess of 17 cents, because there are 288 crates in the average carload, and this divided into $50, amounts to a charge of slightly in excess of 17 cents per crate. The agreement is silent as to the commission on less

than carload shipments. Gerber testified a commission of 20 cents a crate was generally charged on less than carload shipments and that he charged this amount in the present case, and that Sherman approved payment of commissions of consignees in every instance.

The accounting in this case was somewhat confused, but it appears well established that Gerber advanced to or for the account of Sherman a total of $83,781.42, and earned commissions of $5,475.42 (taking the 17 cents per crate figure suggested by the trustee.)

■ Although the evidence is conflicting, we must view it in the light most favorable to the party prevailing in the trial forum. (*Berniker* v. *Berniker*, 30 Cal.2d 439 [182 P.2d 557]; *Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689].) We conclude, generally, that the judgment is based on findings which are supported by substantial evidence in the record and must be affirmed. (*Bolen* v. *Parks* (1957), 149 Cal.App. 2d 460 [308 P. 2d 521].)

■ Cases involving consideration of reasonable cause for belief of a debtor's insolvency under section 60, subdivision b, of the Bankruptcy Act are decided upon their own facts and cases involving different facts are of little assistance. Usually, the determination of the issue rests upon an analysis of the evidence in the individual case. (*McDougal* v. *Central Union Conference Assn.,* 110 F.2d 939; *Cusick* v. *Second Nat. Bank,* 115 F.2d 150, 154.) Here we are convinced that the trial court's finding on this issue is supported by substantial evidence and must be sustained. Our decision as to this issue resolves many of the conflicts presented by the briefs herein.

■ Appellants contend that Gerber's mortgages could not operate to secure further advances because they do not contain a statement of the maximum amount of the advances so secured as is required by Civil Code, section 2975. However, the last sentence of Civil Code, section 2975, creates an exception to this requirement stated in the statute. Where a mortgagee advances money to purchase or furnishes materials for the care and protection of the mortgaged crops the amounts so advanced or expended for the necessary materials are secured in equal rank and status with the original mortgage. (*In re Farley* (1957), 155 F.Supp. 630.) The trial court found that the subsequent advances and expenditures by Gerber were necessary to preserve the crops covered by the mortgage. This finding is based upon substantial evidence in the record. Ordinarily, one who purchases wage

claims is subrogated into the shoes of his assignors, but here Gerber did this to preserve the mortgaged property. Under Civil Code, section 2975, such advances are similarly secured. Since Gerber expended or advanced the sum total of $83,-781.42, most of which money was used for the preservation of the crops, it appears that the entire amount of net sales ($71,111.15) received by Gerber would not repay him the amount of his secured advances.

■ Appellants contend that writings on the checks evidencing the advances of May 31 and June 14 indicate that these advances (totaling $6,000) were not made to preserve the mortgaged crops. Since the evidence supports the trial court's finding that, even after the recovery of the judgment here, bankrupt will be indebted to Gerber in an amount approximating $10,000 it is apparent that, even if $6,000 of Gerber's advances were unsecured, Gerber has not recovered the full amount of his secured advances. Additionally, section 1479 of the Civil Code may also be applicable. It provides:

"Where a debtor, under several obligations to another, does an act, by way of performance, in whole or in part, which is equally applicable to two or more of such obligations, such performance must be applied as follows:

". . . . . . . . . . .

"Three—If neither party makes such application within the time prescribed herein, the performance must be applied to the extinction of obligations in the following order; and, if there be more than one obligation of a particular class, to the extinction of all in that class, ratably:

". . . . . . . . . . .

"4. Of an obligation not secured by a lien or collateral undertaking.

"5. Of an obligation secured by a lien or collateral undertaking."

If these advances were unsecured, subsequent payments made to Gerber were allocated first to payment of the unsecured advances and the later payments were applied to the secured advances. (*Bank of America, etc. Assn.* v. *Kelsey* (1935), 6 Cal.App.2d 346 [44 P.2d 617].)

Since Gerber did not have reasonable cause to believe that bankrupt was insolvent until June 29, payments received by Gerber prior to that date on account of antecedent debts would not effect a voidable preference. (Bankruptcy Act, § 60; *Campanella* v. *Liebowitz*, 103 F.2d 252 (3rd Cir. 1939).)

The record shows that between May 31 and June 28, Gerber received payments greatly in excess of $6,000. Therefore, the repayment of these two advances did not effect voidable preferences.

■ For similar reasons the mortgage received and recorded by Gerber on June 7, 1951, did not create a voidable preference because Gerber did not have reasonable cause to believe that Sherman Company was insolvent at that time.

■ There are additional reasons for affirming the judgment as to Gerber. Section 68 of the Bankruptcy Act provides in part as follows: "In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

In *Half Moon Fruit & Produce Co.* v. *Floyd*, 60 F.2d 799 [9th Cir., 1932], a case remarkably similar in its facts to the instant case, the court in discussing this section said: "At the time of the consignment of the melons by the bankrupt to the (consignee), the (consignee) owed the bankrupt the duty of converting the melons into money for the account of the bankrupt, and it is this obligation of the consignee which the cases above cited held to be a credit in his favor to be offset against the credit of the consignee for moneys previously advanced . . ."

The court also held in this case that the transfer occurs when the goods are delivered to the consignee to be sold by him. The conversion of the melons into money by sale is a mere incident to the transaction. The existence of a voidable preference is determined as of the date of consignment. An examination of the record discloses that Gerber realized $19,-397.62 from melons received from bankrupt on and after June 29, 1951. This figure includes the value of the melons delivered to Spe' ' or for which he refused to pay. The record also shows that on and after June 29, 1951, Gerber paid out more than $20,000 for labor, crates, ice and other materials necessary to harvest the melons. Furthermore, it is not disputed that Gerber was secured for at least $20,000. As stated above, section 1479 of the Civil Code provides that in the absence of agreement or allocation by the parties payments will be applied first to unsecured claims and then to secured claims. Here Gerber, on and after June 29, received less than enough to pay his concededly secured claims. All previous payments therefore could have been applied to unsecured claims and no preference would have been created. The

payments received after June 28 created no preference because Gerber was the only secured creditor of his class.

Insofar as Gerber retained the amount of the commissions to which he was entitled under the agreement, he, as a factor, had a statutory lien upon the melons for the value of the commission and was entitled to deduct the value thereof from the net sales credited to bankrupt's account. (Civ. Code, § 3053.) Such liens are specifically exempted from the operation of section 60a of the Bankruptcy Act and where, as here, they are accompanied by possession and enforced by sale they are exempted from the operation of section 67 of the same act. (See sections 67 b and c of the Bankruptcy Act; and *Half Moon Fruit & Produce Co.* v. *Floyd, supra,* 60 F.2d 799.)

Retention of the value of commissions earned by Gerber did not constitute a preference voidable by the trustee. Even using the lower amount of 17 odd cents per crate contended by the trustee to be correct, Gerber is entitled to retain as commissions earned a total of $5,475.42. The total loans, advances, and commissions earned by Gerber are $89,256.82, taking figures contended by the trustee to be correct. Deducting from this the net sales in the amount of $71,111.15, it is evident that Gerber lacks at least $18,145.67 of being fully repaid. Even upon recovering judgment herein, taking figures vouched for by the trustee, a balance of $8,432.42 will be due Gerber from bankrupt. The trial court's finding that, upon the entire evidence, recovery of judgment herein would leave Gerber approximately $10,000 short of being fully recompensed is supported by the evidence.

In view of this finding and conclusion there is no necessity of determining the question of the validity of Spector's mortgage found to be void by reason of delay in recording, since there remained no property upon which it could operate. The melons were harvested and removed from the fields. (Civ. Code, § 2972.) Gerber's valid mortgages were a prior lien of which Spector had full knowledge.

 The evidence in face of the findings, fails to support the contention of appellants that Gerber took possession of the melon crop on June 17, as mortgagee and continued in possession and abandoned the harvest on July 5, 1951, causing a loss of melons remaining in the fields. Even the testimony of Marty Sherman does not fully sustain this contention.

Spector and the trustee have entered into a compromise, settling between them the question of their entitlement to

the proceeds of the tomato crop on deposit in the superior court. A stipulation by these parties to the appeal has been filed with the clerk of this court, agreeing that, as between them, all rights to this fund have been determined under the petition to compromise such claim.

We perceive no reversible error in the ruling of the trial court in reference to the admissibility of evidence. It appears that a sufficient accounting was had to justify the conclusions reached.

Judgment affirmed.

Shepard, J., concurred.

A petition for a rehearing was denied November 10, 1959.